Linda **WILLIAMS** and Junius Gary and Jeanette Gary, his wife, individually and on behalf of their minor children and all other parents, relatives or minor children similarly situated, Plaintiffs,

v.

Edmund P. **DANDRIDGE**, Jr., Chairman of the Maryland State Board of Public Welfare; Raleigh C. Hobson, Director, State Department of Public Welfare, Calhoun Bond, Mrs. Ralph O. Dulany, Dr. W. Richard Ferguson, Mrs. Charles D. Harris, and J. O. Shuger, Members of the Maryland State Board of Public Welfare, Esther Lazarus, Director of Public Welfare for the City of Baltimore, individually and in their official capacities, Defendants.

Civ. A. No. 19250.

United States District Court
D. Maryland.

Argued: June 25, 1968.

Decided: Dec. 13, 1968.

Supplemental Opinion Feb. 25, 1969.

Joseph A. Matera, Gerald A. Smith and David Packard, Baltimore, Md., for plaintiffs.

Francis B. Burch, Atty. Gen., Frank A. DeCosta, Jr., Asst. Atty. Gen., George L. Russell, Jr., City Sol., and Edwin J. Gutman, Asst. City Sol., Robert F. Sweeney, Deputy Atty. Gen., of Maryland, and George W. Liebmann, Asst. Atty. Gen., for defendants.

Before WINTER, Circuit Judge, THOMSEN, Chief Judge, and HARVEY, District Judge.

WINTER, Circuit Judge:

Before us now [1] on the pleadings, stipulations and testimony are plaintiffs'

---

1. For the reasons stated in an oral opinion from the bench, we heretofore denied a motion to dismiss, based on various grounds. We also indicated that to the extent that the prayers of the complaint might be construed to require the Governor and General Assembly of Maryland to appropriate additional moneys to make larger payments to plaintiffs, such relief was barred by the Eleventh Amendment.

prayers that we declare invalid and permanently enjoin the enforcement of the "maximum grant" regulation of the Maryland Department of Public Welfare which, summarized, provides that, irrespective of the need and eligibility, a family receiving benefits under the Aid to Families with Dependent Children Program (AFDC), established by the Social Security Act of 1935, as amended, 42 U.S.C.A. §§ 601–609, may not receive in excess of $250.00 per month. The declaration sought is that the "maximum grant" regulation is inconsistent with the Social Security Act and that it denies equal protection of the laws. Jurisdiction is properly invoked under Civil Rights Act, 28 U.S.C.A. § 1343(3) and (4), and 42 U.S.C.A. § 1983, and the case is an appropriate one for a three-judge District Court under 28 U.S.C.A. § 2281. King ·v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

Maryland participates in AFDC. 8A Ann. Code of Maryland, Art. 88A, § 44A *et seq.* By regulations approved by the Secretary of Health, Education and Welfare, Maryland has adopted a schedule setting forth standards of need. The schedule lists the monetary need for family units of one to ten persons, with decreasing additional amounts for each person over the original recipient but with a fixed additional amount for each person over ten persons. Maryland has also adopted a "maximum grant" regulation, Maryland Manual of the Department of Public Welfare, Part II, Rule 200, § VII, 1, which provides that, irrespective of the resulting figure after the resources of a family are deducted from its need as prescribed in the schedule, the maximum grant permitted under AFDC in Baltimore City is $250.00 per month.[2] The maximum grant regulation is applicable only to members of a family unit who live together; it does not apply to an eligible recipient who

resides in another household or a child-care institution.

Plaintiffs have sued for themselves and on behalf of the class which they represent. Plaintiff Linda Williams resides with her eight children, who range in age from four years to sixteen. Their father is continuously absent from her home and she and one of her children are in poor health. They are totally without financial resources. This condition did not arise until some time after the birth of her youngest child. Under the standards of need, her family should receive benefits in the amount of $296.15 per month while, in fact, she is granted maximum welfare in the amount of $250.00 per month by reason of the application of the maximum grant regulation.

Plaintiffs Junius Gary and his wife live together with their eight children, who range in age from four years to eleven. Mr. Gary is totally disabled from working for medical reasons, and Mrs. Gary, who is required to remain at home to care for her children, is also in ill health. They are totally without financial resources. This condition did not arise until after the birth of their youngest child and until Mr. Gary became disabled for employment. According to the standards formulated by the Department of Public Welfare they should receive $331.50 per month for themselves and their eight children, but they are limited to a monthly grant of $250.00 by reason of the maximum grant regulation.

If Mrs. Williams were to place two of her children of twelve years or over with relatives, each child so placed would be eligible for assistance in the amount of $79.00 per month, and she and her six remaining children would still be eligible to receive the maximum grant of $250.00. If Mr. and Mrs. Gary were to place two of their children between the ages of

2. In the case of recipients who do not reside in Baltimore City the maximum grant is $240.00 per month. All plaintiffs in the instant case are residents of Baltimore City.

six and twelve with relatives, each child so placed would be eligible for assistance in the amount of $65.00 per month, and they and their six remaining children would still be eligible to receive the maximum grant of $250.00.

From the testimony in the case, it appears that the maximum grant regulation has its genesis and rationale in the fact that the Governor and the General Assembly of Maryland have failed to appropriate sufficient funds for Maryland's share of the cost of AFDC to satisfy the state-determined need of all persons entitled to benefit thereunder. The purpose of the maximum grant regulation is solely to conserve state funds, by allocating state funds (less in amount than state-recognized need) among only some of the persons entitled thereto. Because the amount of federal funds to support AFDC is computed on the basis of the need of recipients, rather than the extent to which the State satisfies that need, the maximum grant regulation has the incidental effect of increasing the federal government's share of the cost of the total program beyond what would be the amount of that share had the maximum grant regulation not been adopted.

- I -

The history, the scope and the basic purposes of the AFDC program, initiated as part of the Social Security Act of 1935, are fully developed in King v. Smith, *supra,* to which reference is made for a fuller treatment. It suffices to state that while State participation in the scheme of cooperative federalism is voluntary on the part of each State, and while each State "is free to set its own standard of need," as well as "to deter-

mine the level of benefits by the amount of funds it devotes to the program" (King v. Smith, *supra,* at 318–319, 88 S.Ct. at 2134), those which desire to take advantage of the substantial federal funds available for distribution to needy children are required to submit an AFDC plan for the approval of the Secretary of Health, Education and Welfare. 42 U.S.C.A. §§ 601–604.[3] The plan, to be valid, must conform to the requirements of the Act and applicable regulations of the Secretary.[4]

Section 402 of the Act, 42 U.S.C.A. § 602, sets forth the mandatory requirements of a state plan for aid and services to needy families with children. Inter alia, the plan must "provide, effective July 1, 1951, that all individuals wishing to make application for aid to families with dependent children shall have opportunity to do so, and that aid to families with dependent children shall be furnished with reasonable promptness to *all* eligible individuals." (Emphasis supplied.) The mandate is clear that, within the framework of state-determined standards of need, the State must meet those needs in regard to "all eligible individuals."

Who are "eligible individuals" is supplied by other provisions of the Act. Section 401 of the Act, 42 U.S.C.A. § 601, states that the legislative purpose of appropriations under AFDC is:

"For the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, *to needy dependent children and the parents or relatives with whom*

---

3. This record does not reflect whether Maryland's "maximum grant" regulation has been given such approval. Presumably, because of its newness, it has not. But approval, while of interest, would beg the question of whether it comports with the Act and the Constitution.

4. Congress has the unquestioned power to fix the terms upon which its allotments

to states shall be disbursed. King v. Smith, *supra;* Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 78 S. Ct. 1174, 2 L.Ed.2d 1313 (1958); Oklahoma v. United States Civil Serv. Com., 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947).

*they are living* to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection * * *." (Emphasis supplied.)[5]

"Dependent child" is defined in § 406 of the Act, as amended, 42 U.S.C.A. § 606(a).[6] Where there exists a "dependent child," the "aid to families with dependent children," which is the object of the legislation, is defined to include money payments or medical care to the relatives with whom the dependent child is living; and if that relative is a parent, to the spouse of such parent, under certain circumstances. 42 U.S. C.A. § 606(b).[7] The amount of such aid, under the circumstances just mentioned, is thus computed by treating the relative, parent or spouse of parent, as the case may be, of the "dependent child" as a part of the family unit.

It will be noted that the definitions contain no limitation on eligibility by reason of the fact that one, who is otherwise a "dependent child," resides in a household with or without one or more other siblings or other persons. Nor do the definitions or any other portion of the Act[8] vest in any state the authority to embroider upon the definition of "dependent child," so as to insert conditions and limitations beyond those imposed by Congress. For practical purposes, Maryland's maximum grant regulation means (assuming that the family lacks other financial resources) that in computing the amount of an award, any dependent child in excess of the fourth dependent child living with both parents, or any dependent child in excess of the fifth dependent living with one parent, does not count as a "dependent child." In effect, therefore, Maryland's maximum grant regulation would permit Maryland to avoid the mandate of § 402 that it provide payments to "all" eligible individuals.[9]

5. As originally enacted, AFDC permitted State disqualification for benefits on the grounds of illegitimacy or state determination that a dependent child did not reside in a "suitable home." As part of legislation outlawing immorality and illegitimacy as disqualifying factors, Congress enacted 42 U.S.C.A. § 608 to permit payments to States for benefits to "dependent children" placed in foster homes and child-care institutions. See discussion King v. Smith, 392 U.S. pp. 322–324, 88 S.Ct. 2128, 20 L.Ed.2d 1118.

6. The full text of § 606(a) follows:
"§ 606. Definitions
When used in this subchapter—
(a) The term "dependent child" means a needy child (1) who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) under the age of twenty-one and (as determined by the State in accord-

ance with standards prescribed by the Secretary) a student regularly attending school, college, or university, its equivalent, or regularly attending a course of vocational or technical training designed to fit him for gainful employment."

7. 42 U.S.C.A. § 608 modifies this definition, however, to permit a child to be treated as a "dependent" child when he has been placed in a foster home or a child-care institution under the conditions set forth in that section. See also, ft. 5, *supra*.

8. We discuss, *infra*, defendants' contention that the Social Security Act Amendments of 1967 constitute implied Congressional recognition of the validity of Maryland's maximum grant regulation.

9. Of course, in the case of a "dependent child" moneys disbursed for him are paid not to him but to a responsible adult, child-care institution, child-placement or child-care agency for his benefit. See, *e. g.*, 42 U.S.C.A. § 608. Other provisions of the Act make clear, however, that a benefit so paid is treated strictly as a benefit for the child and not to the recipient. For example, 42 U.S.C.A. § 602(b) enjoins the Secretary not to approve a State plan which denies aid with

■ Maryland's maximum grant regulation also violates part of the basic philosophy underlying AFDC. As originally enacted, § 406 of the Act, 49 Stat. 629, defined a "dependent child" as one under age sixteen, in need, and living with his parents or a certain class of relatives.[10] The designated class of relatives was expanded in 1956 by 70 Stat. 850, 855.[11] And as we have noted, in 1961 the definition of "dependent child" was amended to permit benefits to be granted to needy children in foster homes or in child-care institutions. The 1961 amendment, 75 Stat. 75, also permitted aid to children whose need arose from unemployment of their parents not attributable to physical or mental incapacity. It is clear, nevertheless, that one of the principal purposes of AFDC was to preserve intact the family unit.[12] The inclusion of relatives, other than parents, and the subsequent expansion of the class of qualifying relatives were to take care of the situations where both parents were dead or continually absent from the home and a relative was acting *in loco parentis.* Provision for aid to children whose parents were unemployed for reasons other than physical or mental incapacity was to respond to need, while

provision for aid to children in foster homes or child-care institutions was, again, to meet need under a scheme which recognized that "there are some home environments that are clearly contrary to the best interests of these children." It is interesting to note that Senate Report No. 165, 87th Cong. (1st Sess.), 1961 U.S. Code Cong. and Adm. News, pp. 1716, 1721, in which the quoted statement was made, reaffirmed that "[t]he objective of the aid to dependent children program is to provide cash assistance for needy children in their own homes." [13]

The Maryland maximum grant regulation is in conflict with this legislative purpose, both as expressed in the Act and in its legislative history. As has been shown, the maximum grant regulation provides a powerful economic incentive to break up large families by placing "dependent children" in excess of those whose subsistence needs, when added to the subsistence needs of other members of the family, exceed the maximum grant, in the homes of persons included in the class of eligible relatives. If this is done, the pernicious effect of the maximum grant regulation is avoid-

respect to any child who has not met certain age or residency requirements; and 42 U.S.C.A. § 605 permits a State to provide counseling and guidance services "[W]henever the State agency has reason to believe that any payments of aid to families with dependent children made with respect to a child are not being or may not be used in the best interests of the child." That the "dependent child" is an "eligible" recipient is manifest.

10. *i. e.,* grandfather, grandmother, brother, sister, stepfather, stepmother, stepsister, uncle or aunt.

11. This amendment added first cousins, nephews and nieces to the qualifying group.

12. Senate Report No. 628, 74th Congress (1935) states: "Through cash grants adjusted to the *needs* of the family *it is possible to keep young children with their mother in their own home,* thus preventing the necessity of placing children in institutions. This is recognized by every-

one to be the least expensive and altogether most desirable method for meeting the needs of these families that has yet been devised." (Emphasis supplied.)
House Report No. 615, 74th Congress (1935) also states: " * * * it has long been recognized in this country that the best provision that can be made for families of this description (without a potential breadwinner) is public aid with respect to dependent children *in their own homes."* (Emphasis supplied.)

13. It is also worthy of note that 8A Ann. Code of Md., Art. 88A, § 44A states: "It is hereby declared that the primary purpose of aid given under this subtitle *is the strengthening of family life* through services and financial aid, *whereby families may be assisted to maximum self-support in homes meeting the requirements for child care* established by law in this State." (Emphasis supplied.) Plaintiffs suggest a conflict between the regulation and this statute. Since plaintiffs do not press the point, we do not consider it.

ed, but the purpose of keeping them in their own home is defeated.

Defendants contend that the portion of the Social Security Act Amendments of 1967 which amended § 403 of the Act, 42 U.S.C.A. § 603, by adding a new subsection (d) thereto, is clear Congressional recognition that a State may impose a maximum grant limitation on benefits which it disburses. In general, § 403 provides for payments to the State of the federal portion of the cost of AFDC and specifies how that portion is to be computed. The text of the new subsection (d) is set forth in the margin.[14]

We do not think that § 403(d) of the Act has the effect which defendants claim. Section 403(d) relates only to a determination of the amount of federal matching funds. It limits federal funds to the number of certain defined individuals who fall within the definition of "dependent children" but it does not purport to affect a State's obligation to *all* of the individuals who fall within that definition if a State participates in AFDC as required by § 602. The limitation on federal funds is applicable *only* (a) to dependent children under age 18 (while the definition of "dependent children" contained in § 406(a) of the Act includes some children between 18 and 21), and (b) to dependent children deprived of parental support by reason of the continued absence of a parent while the definition of "dependent child" contained in the Act also includes need arising from the death or physical

or mental incapacity or unemployment of a parent. By contrast, Maryland's maximum grant regulation cuts a broad swath on a non-selective basis.

Much of the legislative history of new subsection (d) is irrelevant, but there is enough history to provide an explanation for its selective operation. House Report No. 544, 90th Cong., 1st Sess., p. 110, where subsection (d) had its genesis, states that its purpose would limit federal expenditures in the absent parent subcategory of "dependent children," which is the fastest growing subcategory of need, and "should also give the States an incentive to make effective use of the constructive programs[15] which the bill would establish." The addition of subsection (d) was eliminated by the Senate but reinserted, in modified form, by the Conference Committee. In the Second Session of the 90th Congress, another effort was made in the Senate to eliminate subsection (d), but the attempt was abortive.

The statement of Representative Mills, who was Chairman of the House Ways and Means Committee, where the AFDC freeze provision originated and who was also floor manager of the bill, is significant in explaining the purpose of the bill and *in negating the effect claimed for it by defendants.* He said:

"Finally, Mr. Chairman, the bill would add a provision to present law which would limit Federal financing for the largest AFDC category—where the parent is absent from the home—to the proportion of each State's total child

14. "(d) Notwithstanding any other provision of this Act, the average monthly number of dependent children under the age of 18 who have been deprived of parental support or care by reason of continued absence from the home of a parent with respect to whom payments under this section may be made to a State for any calendar quarter after June 30, 1968, shall not exceed the number which bears the same ratio to the total population of such State under the age of 18 on the first day of the year in which such quarter falls as the average monthly number of such dependent children under the age of 18 with respect

to whom payments under this section were made to such State for the calendar quarter beginning January 1, 1968, bore to the total population of such State under the age of 18 on that date."

15. The 1967 Amendments, P.L. 90–248, 81 Stat. 821, *inter alia*, established a work incentive program for recipients, provided for the employment of qualified recipients in administering the program and provided means for locating parents who desert or abandon dependent children, including the furnishing of last-known addresses by the Internal Revenue Service.

population that is now receiving AFDC in this category. This provision, we believe, would give the States an additional incentive to make effective use of the constructive programs which the bill would establish. Moreover, this *limitation on Federal matching will not prevent any deserving family from receiving aid payments. The States would not be free to keep any family off the rolls to keep within this limitation* because there is a requirement in the law that requires equal treatment of recipients and uniform administration of a program within a State. * * *" 113 Cong. Rec. H. 10670 (August 17, 1967; unbound) (Emphasis supplied.) [16]

Because of its selective nature, because it applies only to a determination of the amount of a federal grant and because its legislative history shows that it had a special purpose other than that ascribed to it by defendants, we conclude that subsection (d) is of no aid or comfort to defendants. Thus, the basic purpose of the Act that, when a State participates in AFDC, all dependent children receive benefits thereunder according to need is unsullied, and the Maryland maximum grant regulation is manifestly in conflict. Therefore, Maryland's maximum grant regulation cannot stand.

## - II -

Our view that the Maryland regulation is invalid is reinforced by our conclusion that the regulation cannot stand under the equal protection clause. It is, therefore, appropriate that we discuss the constitutional issue.

█ We have searched the record in vain for any state purpose to be served by the maximum grant regulation other than to fit the total needs of the State's dependent children, as measured by the State's standards of their subsistence requirements, into an inadequate State appropriation. The search was important, and the absence of another reason fatal to the defense, because, clearly, dependent children of large families receive different treatment from dependent children of small families. Discrimination of this type, not to run afoul of the equal protection clause, must be founded on reason in the light of its purpose. McLaughlin v. Florida, 379 U.S. 184, 189, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). While a State may classify persons for various purposes, it may not do so on arbitrary or irrational grounds. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). As most recently stated by the Supreme Court, in a case holding a wrongful death statute which denied recovery to illegitimate children while permitting recovery to lawful issue invalid under the equal protection clause:

"While a State has broad power when it comes to making classifications * * * it may not draw a line which constitutes an invidious discrimination against a particular class. * * * Though the test has been variously stated, the end result is whether the line drawn is a rational one. * * *" Levy v. Louisiana, 391 U.S. 68, 71, 88 S.Ct. 1509, 1511, 20 L.Ed.2d 436 (1968).

See also, Glona v. American Guar. & L. Ins. Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968).

█ That under these rules the maximum grant regulation is offensive is easily demonstrable. AFDC is a program to provide support for dependent children. By the standards of need set by Maryland, a dependent child is in as great need and as deserving of aid, whether he be the fourth or the eighth child of a family unit, although if the

16. In regard to the last part of Chairman Mills' statement, it should be noted that § 402 of the Act, 42 U.S.C.A. § 602, requires that AFDC be effective in all political subdivisions of a participating State, as well as aid be furnished with reasonable promptness to all eligible individuals.

latter, the amount of his need may not be quite as great as that of the former, because it is cheaper to provide clothing, food and shelter for the eighth child than for the fourth. Yet, the maximum grant regulation, in accomplishing its purpose of conservation of inadequate funds, assumes that a child, because he is the eighth (or any other number where to grant him benefits would bring the aggregate benefits to the family unit over the maximum grant) is either not in need or that his need must go unsatisfied. Reason and logic will not support such a result. The fact that such a child, if moved to the home of an eligible relative, may receive such benefits lends additional support to this conclusion. In effect, Maryland impermissibly conditions his eligibility for benefits upon the relinquishment of the parent-child relationship. Cf., Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The result we reach is fully in accord with that of other courts which have considered the same or similar questions. Collins v. State Board of Social Welfare, 248 Iowa 369, 81 N.W.2d 4 (1957); Anderson v. Schaefer, (N.D. Ga.1968); Metcalf v. Swank, 293 F.Supp. 268 (N.D.Ill.1968) (dictum). We hold, therefore, that the maximum grant regulation transgresses the equal protection clause.

- III -

■ Lest our holdings be misunderstood, some additional words are required. We do not hold that Maryland must appropriate additional funds to support its participation in the program of AFDC; we reiterate our previous holding that the Eleventh Amendment deprives courts of the United States from jurisdiction to grant such relief.

We hold only that if Maryland has appropriated insufficient funds to meet the total need under AFDC, as measured by the standards for determining need

that Maryland has prescribed, Maryland may not, consistent with the Social Security Act or the equal protection clause, correct the imbalance by application of the maximum grant regulation. No other proposed solution to this problem is before us, and we express no other opinion.

Within ten days counsel may agree upon and present a form of order consistent with these views.

## SUPPLEMENTAL OPINION ON MOTION

After the filing of our opinion in this case, defendants filed a multi-faceted motion, purportedly under Rules 52(b) and 59, Fed.R.Civ.P., in which they ask, alternatively, that we amend our findings of fact and judgment, grant a new trial, or receive additional evidence and alter or amend the judgment. Basically, the new or additional facts that defendants want us to consider are not in the nature of newly-discovered evidence; and no compelling excuse is offered as to why they were not previously brought to our attention.[1] Understandably, plaintiffs vigorously question defendants' right to proceed, and they cite persuasive authority in support of their position.

The case is an important one. Proof has been offered to establish that twenty-seven states have maximum grant regulations similiar to that of Maryland; other litigation questioning their validity is pending in other courts. In an effort to arrive at a correct decision, we should give full and complete consideration to all relevant materials. We prefer, therefore, to deal with the motion on its facts and the merits of the contentions it presents, rather than on the procedural grounds urged by the plaintiffs.

As will appear from what is said hereafter, the motion is granted in part and denied in part.

---

1. The facts, themselves, are not in dispute. They were stipulated to be true in open court at the hearing on the motion; others were the subject of a post-hearing written stipulation.

–I–

In regard to the question of the proper construction to be placed on the Social Security Act of 1935, as amended, and whether the Maryland maximum grant regulation conflicts therewith, defendants point out that Maryland has had a maximum grant regulation in some form continuously since January 1, 1947. It is asserted that the Secretary of Health, Education and Welfare (HEW) has "approved" the Maryland regulation, as well as its counterpart in some twenty-seven other states, and that this "approval" is entitled to great weight, if, indeed, it is not conclusive, in deciding whether the regulation conflicts with any provision of the Act. The text of the maximum grant regulations in other states is not before us; nor is any evidence of how they are applied. Finally, it is contended that the legislative history of clause (9) of § 402 [2] indicates that it has a more restrictive meaning than the one we ascribed to it, so that there is no conflict between it and the regulation.

We accept the correction that the Maryland maximum grant regulation is not new and that it has its counterpart elsewhere. We find that HEW has never expressly disapproved the regulation; whether it has approved it is another matter, as is the legal effect of what has been done. We state first, drawing on the parties' stipulation, what HEW has and has not done.

HEW has at no time issued any regulations dealing specifically with the problem of maximum grant regulations, nor has it circulated any reasoned decisions or statements detailing its position. Indeed, there is no indication whatever that any of the arguments urged in this proceeding or adopted in our previous opinion have been presented to HEW. The sole contacts which HEW has had with the regulation in issue, so far as we are informed by the parties, are as follows: (1) at various times HEW has "incorporated" revisions of the maximum grant regulation into Maryland's previously approved AFDC plan; (2) HEW issued, in October, 1962, a booklet entitled "State Maximums and Other Methods of Limiting Money Payments to Recipients," which details, *inter alia*, the AFDC maximum grants in the respective states employing such regulations; (3) an Interim Policy Statement of May 31, 1968, specifies that a state AFDC plan must provide by July 1, 1969, for increases in any maximum grants in order to reflect changes in living costs.

■ From the foregoing, we distill the obvious, namely, that HEW implicitly considers maximum grant regulations not to be violative of the Act. In view of the fact, however, that there is no indication from administrative decision, promulgated regulation, or departmental statement that the question of the conformity of maximum grants to the Act has been given considered treatment,[3] we believe that the various actions and inactions on the part of HEW are not entitled to substantial, much less to decisive, weight in our consideration of the instant case.

■ In adopting this view, we cast no doubt whatsoever upon the general doctrine that the views of administrative agencies entrusted with the administration of a statute are to be given due deference when issues of statutory interpretation arise. See, generally, Annot., Administrative or Practical

---

2. Clause (9) is the portion of § 402, 42 U.S.C.A. § 602, which requires that a State AFDC plan *must* include a provision:

"(9) * * * effective July 1, 1951, that all individuals wishing to make application for aid to families with dependent children shall have opportunity to do so, and that aid to families with dependent children shall be furnished with reasonable promptness to all eligible individuals * * *."

Since the 1968 amendments, clause (9) has become clause (10) of § 402.

3. Some corroboration for this statement is found in the implicit assumption in the discussion of maximum family grants, Note, Welfare's "Condition X," 76 Yale L.J. 1222, 1232–1233 (1967).

Construction of Statute as Precedent for Judicial Construction, 84 L.Ed. 28 (1939). Nevertheless, whether administrative interpretation in the abstract is deemed to be "pertinent," to have "weight," to have "persuasive weight," or to be of such significance that it "ought not to be overruled without cogent reasons," Anderson v. McKay, 94 U.S.App.D.C. 11, 211 F.2d 798, 805, cert. den., 348 U.S. 836, 75 S.Ct. 51, 99 L.Ed. 660 (1954), the attitudes, practices and interpretations of an administrative agency are certainly not absolute rules of law but, at best, merely "helpful guides to aid courts in their task of statutory construction." Sims v. United States, 252 F.2d 434, 438 (4 Cir. 1958), aff'd., 359 U.S. 108, 79 S.Ct. 641, 3 L.Ed. 2d 667 (1959). The ultimate authorities on issues of statutory interpretations are the courts, Volkswagenwerk etc. v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed. 2d 1090 (1968), which have the final responsibility to declare what a statute means. Fishgold v. Sullivan Drydock & Repair Corp., 154 F.2d 785, 790 (2 Cir.) (L. Hand, J.), aff'd., 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230, 167 A.L.R. 110 (1946). To the same effect, see, *e. g.*, Folsom v. Pearsall, 245 F.2d 562, 564–565 (9 Cir. 1957); Commissioner of Internal Revenue v. Winslow, 113 F.2d 418, 423, 133 A.L.R. 405 (1 Cir. 1940). Where a conflict arises between the administrative and judicial constructions of a statute, the latter will necessarily prevail. Deeg v. Lumbermen's Mut. Cas. Co., 279 F.2d 491, 494 (10 Cir. 1960); Cory Corp. v. Sauber, 266 F.2d 58, 61 (7 Cir. 1959), rev'd on other grounds, 363 U.S. 709, 80 S.Ct. 1331, 4 L.Ed.2d 1508 (1960); Louisiana Pub. Serv. Comm'n. v. SEC, 235 F.2d 167, 172 (5 Cir. 1956), rev'd on other grounds, 353 U.S. 368, 77 S.Ct. 855, 1 L.Ed.2d 897 (1957); Woods v. Benson Hotel Corp., 177 F.2d 543, 546 (8 Cir. 1949). See, 1 Davis Administrative Law Treatise, § 5.06, at 326–328 (1958). In determining the proper weight to be accorded to an administrative decision, account must be taken of the consistency of the agency's interpretation with the underlying purposes of the statute which is being construed. P. Lorillard Co. v. FTC, 267 F.2d 439, 443 (3 Cir.), cert. den., 361 U.S. 923, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959). In no event is a court "compelled to follow an administrative interpretation that it regards as inconsistent with the legislative purpose of the provision in issue." In re Petition of Chin Thloot Har Wong, 224 F.Supp. 155, 165 (S.D.N.Y.1963).

 Furthermore, it is clear that the thoroughness with which an administrative agency has dealt with a particular problem of statutory construction is a highly relevant factor in determining the weight to be assigned to the agency's resolution of the matter. Such weight will be dependent upon "the thoroughness evident in * * * [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). If the agency's construction has resulted from an uncontested nonadversary proceeding, it has been said that the agency's interpretation is entitled to "relatively little weight." SEC v. Sterling Precision Corp., 393 F.2d 214, 220 (2 Cir. 1968). See, Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 290, 66 S.Ct. 1105, 90 L.Ed. 1230, 167 A.L.R. 110 (1946). Finally, to the argument that Congress has not stepped in to alter or amend HEW's apparent interpretation that Maryland's maximum grant regulation conforms to the Act, we are reminded of our Court of Appeals' admonition that "courts are properly chary of equating mere inaction with approval, in the absence of a solid foundation for the inference of conscious ratification [by Congress]." Duncan v. Railroad Retirement Bd., 375 F.2d 915, 919 (4 Cir. 1967).

If the unequivocal command that "aid * * * shall be furnished with reasonable promptness to *all* eligible individuals," were all that we must consider, we

would not be disposed, in the light of the legal principles which we have set forth and of the limited nature of the administrative action taken by HEW in regard to maximum grant regulations, to assign controlling significance to HEW's apparent views. To the extent that these views hold that maximum grant regulations are consistent with the language and purposes of the Act, we would decline to follow them. See, King v. Smith, 392 U.S. 309, 333, n. 34, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

We turn to the argument that the legislative history of clause (9) demonstrates that it has a more restricted meaning than we have given it. Essentially, defendants' argument is that the portion of the Social Security Act Amendments of 1950, 64 Stat. 549, which added clause (9), on which we placed principal reliance in concluding that there was a conflict between the regulations and the Act, was addressed to a practice in Maryland and in other states of dealing with revenue crises in AFDC by instituting a freeze on the receipt of new AFDC applications, rather than to devise some other uniform or equitable way of reducing AFDC expenditures. The requirement of clause (9)—"that all individuals wishing to make application for aid to families with dependent children shall have the opportunity to do so"—was, so the argument runs, specifically directed to this practice. The "all eligible individuals" to whom aid must be furnished, the argument continues, are the applicants for aid referred to in the beginning of clause (9), and not the family members benefited by the application.

We reject defendants' second argument for the reasons set forth in footnote 9 of our original opinion. Although clause (9) may contemplate that the ap-

plication for aid be made by a responsible adult, child-care institution, child-placement or child-care agency, it requires that the amount of aid granted be commensurate with the needs of all of those on behalf of whom an application is made. Defendants' argument is essentially that the command of the entire clause is met if the applicant, i. e., the responsible adult, is furnished some aid, even though the amount is less than that which the state has determined is the extent of need and appropriate benefit for the members of his family. If his needs as an individual are satisfied in whole or in part, the clause requires no more. The basic purpose of AFDC to provide support for "dependent children" makes the hollowness of this argument manifest.

We see nothing inconsistent between the claimed legislative intent as expressed in clause (9) and the literal meaning we have given it. If the evil to be corrected was the states' freezing consideration of new applications for aid, it would not be unreasonable for Congress to say that the application should be received, and considered, and that the amount of aid should be granted promptly to *all* who were eligible, lest some state devise some other subterfuge, such as receiving an application and considering it but postponing any benefits thereon or granting less than the benefits indicated thereon until it was financially more convenient to do so.

More importantly, closer scrutiny of the legislative materials relevant to the purposes of clause (9) satisfies us that we have not expanded its meaning beyond the initial legislative intent in its enactment. The basic purpose of clause (9) was explained in the report of the House of Representatives where the bill, H.R. 6000, which added clause (9), originated.[4] H.R. 6000 was not reported

4. The pertinent sections of the report read:
 "D. Opportunity to apply for and receive assistance promptly
 Shortage of funds in aid to dependent children has sometimes, as in old-age assistance, resulted in a decision not to take more applications or to keep eligi-

ble families on waiting lists until enough recipients could be removed from the assistance rolls to make a place for them. As noted in the discussion of this problem in the section on old-age assistance, this difference in treatment accorded to eligible people results in undue hardship on needy persons and is inappropriate in

by the Senate until the following session, and, while the House version required a state to furnish aid "promptly," clause (9) was amended in the Senate to require a state to furnish aid "with reasonable promptness." This substitution in phraseology was thought to assure that a state would have sufficient time to make investigations. It was the only amendment; otherwise, the Senate sought to achieve the same objectives as the House.[5] It should be stressed that H.R. 6000 also expanded AFDC (which was theretofore a program solely of aid to children) to include the relative with whom any dependent child is living. The purpose of the expansion was described in the report of the House Committee.[6] The essential emphasis, in this statement, on the needs of the dependent

a program financed from Federal funds. The requirement that State plans must provide opportunity to apply to all persons wishing to do so and that assistance shall be furnished promptly to all eligible families is included in the proposed amendments to title IV of the Social Security Act."

\* \* \* \* \*

"Requirement relating to opportunity to apply for assistance and receive it promptly

The provisions of section 3(a) of the Social Security Act are also amended by the bill by the addition of a new clause (9). This clause would add a specific requirement designed to make it clear that a State plan, in order to be approved, must provide that all individuals wishing to make application for assistance shall have an opportunity to do so and that assistance shall be furnished promptly to all eligible individuals. This new requirement would take effect July 1, 1951."

H.R.Rep.No. 1300, 81st Cong., 1st Sess., pp. 48, 148 (1949).

5. "TITLE III-AMENDMENTS TO PUBLIC ASSISTANCE AND MATERNAL AND CHILD WELFARE PROVISIONS OF THE SOCIAL SECURITY ACT
REQUIREMENTS OF STATE PLANS
\* \* \* \* \*
Requirements relating to opportunity to apply for and receive assistance.

The provisions of section 3(a) of the Social Security Act are also amended by the bill by the addition of a new clause (9). This clause would add a specific requirement designed to make it clear that a State plan, in order to be approved, must provide that all individuals wishing to make application for assistance shall have an opportunity to do so and that assistance shall be furnished with reasonable promptness to all eligible individuals. This new requirement would take effect July 1, 1951.

The same addition has been made by sections 321 and 341 of the bill to sections 402(a) and 1002(a), respectively,

of the Social Security Act, although in the latter case the new clause is numbered (11).

These amendments proposed by the bill are the same in substance as those proposed on the same subject by the bill as passed by the House except that the latter would have required the assistance to be furnished 'promptly' instead of 'with reasonable promptness' as proposed by your committee. The change was made in order to assure the States reasonable time to make investigations and complete any other action necessary to determine eligibility and extent of need for assistance."

S.Rep.No. 1669, 81st Cong., 2nd Sess.; 2 U.S.Code Cong. Ser., pp. 3470-3471 (1950).

6. "XIV. AID TO DEPENDENT CHILDREN
\* \* \* \* \*
"A. Inclusion of mother or other relative caring for child

In the present law, aid to dependent children is defined as payments with respect to a dependent child. No specific provision is made for the need of the parent or other relative with whom the child is living. Particularly in families with small children, it is necessary for the mother or another adult to be in the home full time to provide proper care and supervision. Since the person caring for the child must have food, clothing, and other essentials, amounts allotted to the children must be used in part for this purpose if no other provision is made to meet her needs. The maximum monthly amount of assistance in which the Federal Government will now share is $27 for one child in a family and $18 for each child beyond the first.

Because of the lack of specific provision for Federal participation in assistance to the mother or other relative and the inadequacy of the $27 and $18 maximums to cover the cost of essentials for the children and an adult as well, States have been forced to make a very large proportion of payments larger than the maximum amounts subject to Federal

children, and the concept that aid to the relative with whom the children were living was necessary *so as not to diminish the realizable benefit to the children* belies the interpretation of clause (9) pressed by defendants.

Inexplicably, however, Congress, in the Social Security Amendments of 1967, P.L. 90–248, 81 Stat. 821, amended § 402 of the Act in a manner which may have a substantial effect on the apparent conflict between the regulation and the Act. The record, however, is insufficient for us to express any final conclusion.

The amendment, contained in § 213(b) of the Act, cited as Social Security Amendments of 1967, added a new clause to § 402(a), to be known as clause (23), which requires, as an additional condition, that a state AFDC plan must:

"provide by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, *and any maximums that*

sharing. In December 1948 about one-half of all payments were above the maximums. More than three-fourths of all payments exceeded these amounts in 24 States. Often States have been unable to make payments that were at all realistically related to the need of the dependent children and the relative caring for them.

To correct the present anomalous situation wherein no provision is made for the adult relative and to enable States to make payments that are more nearly adequate, the bill would include the relative with whom the dependent child is living as a recipient for Federal matching purposes. The maximum amount of assistance for a relative in which the Federal Government would share would be $27. The maximums of $27 for one child in a family, and $18 for each additional child, would remain unchanged. Thus, for a relative and one dependent child the maximum amount of the payment subject to Federal sharing would be $54 instead of $27. For a three-child family, the maximum would be $90 instead of $63."

H.R.Rep.No. 1300, 81st Cong., 1st Sess., pp. 45–46 (1949).

*the State imposes on the amount of aid paid to families will have been proportionately adjusted."* (Emphasis supplied.)

Section 213(a) amended various other sections of the original Act to provide that recipients under various programs need not suffer a reduction in benefits if they had income up to $7.50 per month, instead of the previous ceiling of $5.00 per month, i. e., 42 U.S.C.A. §§ 302(a) (A) (i) [state old-age and medical assistance plans], § 1202(a) (8) (C) [state plans for aid to blind], § 1352(a) (8) (A) [state plans for the permanently and totally disabled], and § 1382(a) (14) (D) [state plans for aid to aged, blind or disabled or for such aid and medical assistance for aged].

Section 213 of the amending Act was added to the House Bill by amendment in the Senate, later concurred in by the House.[7] As it shows on its face, § 213(b) was designed to increase benefits to keep pace with increased living costs. The references to it in the committee reports are no more informative.[8] Elsewhere in

7. See discussion in Conference Report No. 1030, 90th Cong., 1st Sess., 2 U.S.Code Cong. & Admin.News, pp. 3179, 3208 (1967).

8. Clause (23) was added by § 213(b) of the amending Act. As passed by the Senate, the amending Act added clause (23) by § 213(a) and referred to clause (23) as clause (24). In the Senate Report, the following was said:
"Paragraph (5) of section 213(a) of the bill amends section 402(a) of the act by adding (after the new clause (23) added to such sec. 402(a) of the act by sec. 211(a) of the bill) a new clause (24) which requires a State plan for the dependent children program to provide that by July 1, 1969, and at least annually thereafter, the amounts used by the State to determine the needs of individuals will be adjusted to reflect fully changes in living costs since such amounts were established, and that any maximums that the State imposes on the amount of aid paid to families will be proportionately adjusted."
Senate Report No. 744, 90th Cong., 1st Sess., 2 U.S.Code Cong. & Admin.News, p. 3133 (1967).

the extensive amendments to the original Act, benefits were increased generally,[9] the conditions attaching to AFDC benefits were liberalized to encourage AFDC recipients to make the transition to becoming selfsupporting, and new protections to children in AFDC families and provisions to make more certain the fulfillment of parental responsibilities were added.[10]

The Conference Report which recommended concurrence in the Senate amendment contained no discussion of its purpose or need, beyond the barest description of its terms. Conference Report No. 1030, 90th Cong., 1st Sess., 2 U.S.Code Cong. & Admin.News, p. 3209 (1967).

9. See, e. g., Senate Report No. 744, 90th Cong., 1st Sess., 2 U.S.Code Cong. & Admin.News, pp. 2834, 2835 [old-age, survivors, and disability insurance], 2836 [health insurance], 2838 [public assistance].

10. Senate Report No. 744, op. cit. n. 8. At p. 2837, the general program in this report was thus summarized:

"AID TO FAMILIES WITH
DEPENDENT CHILDREN

The bill would make the following reforms in the aid to families with dependent children programs:

(1) For the purpose of providing greater incentives for appropriate members of families drawing aid to families with dependent children (AFDC) payments to obtain employment so that they need no longer be dependent on the welfare rolls the bill would—

(a) exempt a portion of earned income for members of the family who can work;

(b) establish a new work incentive and training program for individuals to be administered by the Department of Labor upon referral by the State welfare agency;

(c) require State welfare agencies to assure adequate child care arrangements for the children of working mothers;

(d) require the State welfare agencies to establish a social service plan for each AFDC family; and

(e) modify the optional unemployed fathers program to provide for a uniform definition of unemployment throughout the United States.

In order to enable the States to implement these requirements, the Federal Government would supply Federal matching for services (including child welfare and day care) which the States would be required to furnish. Federal matching would also be provided for training, supervision, materials, and other items and services needed in the work incentive program."

The provisions of existing law and proposed changes to liberalize the earnings exemptions of dependent children are described at p. 2861.

The overall changes in the AFDC program are summarized at pp. 2982, 2983, as follows:

"The plan which the committee has developed, with the advice and help of the Department of Health, Education, and Welfare and the Department of Labor, amounts to a new direction for AFDC legislation. It follows that the basic outline of the bill passed by the House but incorporates certain desirable changes in the method of administration and program emphasis. The committee is recommending the enactment of a series of amendments to carry out its intent of reducing the AFDC rolls by restoring more families to employment and self-reliance.

The first series of amendments is designed to encourage and make possible the employment of adults in AFDC families. Three provisions are aimed at this purpose:

(1) The establishment of a work incentive program under the Department of Labor for the purpose of restoring members of AFDC families (including those with little or no work experience) to regular employment through counseling, placement services and training, and arranging for all others to get paid employment in special work projects to improve the communities in which they live;

(2) A requirement that all States furnish day-care services and other social services to make it possible for adult members of the family to take advantage of the work and training opportunities under the work incentive program; and

(3) A requirement that all States exempt part of the AFDC recipient's earnings to provide incentives for work in regular employment.

The second series of amendments would set up new protections for the children in AFDC families and would make more certain the fulfillment of parental responsibilities:

(1) A requirement that the States establish a comprehensive plan of social services for each AFDC child to assure

In the context in which clause 23 was added; that is to say, having regard to the overall amendments to the AFDC program made by the amending Act, we find it difficult to say that § 213(b) represented a considered judgment by Congress that it wished to validate all maximum grant regulations and that it wished to depart from the basic objectives of prior Congresses, reaffirmed by it, that benefits under AFDC be granted to *all* eligible individuals and that to the maximum extent feasible for their interests dependent children be kept in their own family units.[11] The brevity of the discussion of § 213(b) in the legislative reports, as compared to the considered treatment of other amendments, leads to the reasonable assumption that Congress gave no real thought to the effect of maximum grant regulations in its oft-expressed basic legislative purposes, but simply concluded that if it was increasing benefits generally it should include a direction that maximum grants should be increased, also. Yet, clause (23) is unmistakable recognition by Congress that some states have maximum grant regulations, and, utilizing

accepted canons of statutory construction, we are bound to give effect to this recognition.

The problem is what is the scope of Congressional recognition and implied approval of maximum grant regulations. The language of Congress in clause (23) is general and the Congressional intent expressed therein is uncertain. Manifestly, it cannot validate that which the Constitution does not permit. Equally important, it must be construed in the light of all other provisions of the Social Security Act, as amended, so as to achieve an harmonious whole. Even if clause (23) is treated as an implied amendment of clause (9), we do not know, and the parties have offered no proof to show us, what are the terms and provisions of the maximum grant regulations of other states and how they are applied. To be specific, we do not know if they are similar and are uniformly applied like that of Maryland to encourage the disbanding of large families so that Congressional recognition may be deemed an amendment of § 402 of the Act, as well as a departure from the original legislative intent of clause (9)

the child the maximum opportunity to become a productive and useful citizen;

(2) A requirement that State welfare agencies refer cases of child abuse or neglect to appropriate law-enforcement agencies and courts;

(3) A requirement that protective payments and vendor payments be made where appropriate to protect the welfare of the children;

(4) Federal payments for additional foster care situations under the AFDC program;

(5) A requirement to assure that fathers who desert or abandon their families will contribute to the support of their families by using available tax records and the enforcement power of the Internal Revenue Service. In addition, there would be a requirement that the States establish separate units to enforce the child-support laws, including financial help to the courts and prosecuting agencies to enforce court orders for support; and

(6) A program of emergency assistance to families with minor children for a temporary period.

(7) A more definitive and uniform program for the children of unemployed fathers.

The third series of amendments would make other changes in the program designed to deal with the expanding AFDC rolls.

(1) A requirement that all States establish programs to reduce the number of children born out of wedlock; and

(2) A requirement that all States offer family planning services to appropriate AFDC recipients."

11. As part of the amending Act, Congress also amended § 401, 42 U.S.C.A. § 601, in a technical respect not itself significant here. What is significant is that an amendment was made to the section containing the recital that a purpose of AFDC was "to help maintain and strengthen family life" without any alteration thereof. Presumably, family life is strengthened and maintained by holding a family together. Yet, as has been previously shown, the Maryland maximum grant regulation in its operation encourages the very opposite.

and the underlying purposes of the AFDC program to strengthen family life.

In short, clause (23) may well be properly construed to imply recognition by Congress of the concept of maximum grant regulations in the abstract without the additional implication that a congressional imprimatur has been placed upon every conceivable maximum grant regulation, no matter what its operative effects may be in furthering or retarding basic congressional policy. Thus, while Congress has indicated its view that a maximum grant regulation is not *per se* in conflict with the Act, prior to the 1967 amendments, as we have construed it, we cannot, on the present record, impute to Congress the intention to endorse specifically the Maryland regulation with its pernicious results, absent a statement of endorsement or circumstances of endorsement which speak with unmistakable clarity. In other circumstances, we would direct the parties to present additional proof to enable us to resolve this issue. We do not find this necessary in the instant case, however, because we are still satisfied that the regulation cannot hurdle the constitutional barrier of the equal protection clause.

–II–

In regard to the question of whether Maryland's maximum grant regulation denies equal protection of the law, the evidence before us at the original trial was crystal-clear that the only reason why the maximum grant regulation was continued was financial, i. e., that the Governor and General Assembly of Maryland had failed to appropriate sufficient funds to finance the cost of AFDC, absent the operative effect of the maximum grant regulation in reducing expenditures. Now defendants assert that, at least initially, the maximum grant regulation was rationally supportable for constitutional purposes on the basis of

the so-called "principle of less benefit." The thrust of the principle in the case at bar is that public assistance or welfare programs should not serve as an inducement to individuals to abandon useful employment, or to decline useful employment, or to abandon their families and the obligation to support them. Accordingly, the benefits derivable from such assistance should, in no event, be greater than the remuneration which could be achieved from gainful employment. In order to achieve this result, so the argument runs, the maximum grant is keyed to the minimum wage, so that an individual family receiving assistance would obtain no more than a family in which one member thereof was employed at the minimum wage level.

Specifically, under the principle of "less benefit," defendants assert that the maximum grant regulation serves a rational function in that it (a) discourages desertion of children by the wage earner or the wage earners of the family, (b) it provides an inducement to a surviving parent to seek employment, and (c) it encourages parents to limit the sizes of their families.

■ Even if we assume that the maximum grant regulation was adopted for the purposes that defendants assert,[12] and even if we accept the contention that the validity of the regulation under the equal protection clause may be saved by the original purposes for its promulgation, notwithstanding that those are not the purposes for its continuance, we find no merit in the argument that the less benefit principle may validate this regulation. We reach this conclusion because the regulation on its face is not limited to any subcategories of AFDC eligibles, but purports to apply, and is applied, to AFDC eligibles as a group. While the purposes which defendants assert may have a logical connection with one or more subcategories of AFDC eligibles, alone

12. On the evidence before us the conclusion is equally tenable that the maximum grant regulation was adopted to make the entire AFDC program more palatable politically. Perhaps those purposes were inspired, however, by unarticulated notions of the "principle of less benefit."

**468**

or in combination, they have no logical connection with the group as a whole; hence, the regulation is invalid on its face for overreaching. We turn to a consideration of the claimed rational functions which defendants assert.

AFDC is not limited to dependent children or families with dependent children deprived of parental support or care by reason of continued absence from the home. Discouragement of desertion as a rational basis for the maximum grant regulation can have application only to the continued absence subcategory of AFDC; it can have no application to dependency which arises because of death, unemployment, or physical or mental incapacity of the wage earner. The named plaintiffs Junius Gary and Jeanette Gary are examples of eligibles to whom this purpose has no logical application. Even when eligibility for AFDC is predicated upon continued absence from the home, dependent children and families with dependent children may still receive payments in excess of the maximum grant, if those children in number in excess of the cut-off point are placed with other relatives, a child-care institution, a child-placement or a child-care agency. A parent who is willing to desert to give his children or his family eligibility for AFDC on this basis can hardly be presumed to voice stringent objection to further breakup of the family unit to gain advantage from this unusual aspect of the Maryland regulation. Thus, the maximum grant regulation not only subverts the statutory goal of preserving intact the family unit, but it is also ineffective to discourage eligibility by continued absence from the home.

The same is true with regard to the claimed purpose of inducing a surviving parent to seek employment, namely, that it is inapplicable to inability to work or lack of employment and is ineffective to achieve its purpose even in the subcategory to which it might be efficacious. Other considerations also come into play. The basic purpose of AFDC is to aid needy *children,* and to achieve this schedules of need based upon the cost-of-living have been established by the state. The principle of "less benefit" can have no application to those under the age when the state will permit them to work.[13] The evidence indicates that only a relatively small percentage of families (166 out of 2,537, or 6.5%) receiving AFDC payments are classified as having employable numbers. To what percentage of the 6.5% of total AFDC beneficiaries the maximum grant regulation is applicable is not disclosed. The evidence does show that the plaintiffs Junius Gary and Jeanette Gary, his wife, are receiving AFDC payments because of sickness and disability, and neither they nor the named plaintiff Linda Williams are employable. It is simply irrelevant to apply the "less benefit" principle of encouraging employment to individuals who could not, in any event, be gainfully employed.

The state may have a legitimate interest in reducing its welfare rolls by encouraging those capable of so doing to seek and maintain gainful employment, but this goal can be furthered by such devices as work incentive programs, which are aimed precisely at aiding and encouraging those who are in fact employable,[14] or by limiting the application

---

13. Like every enlightened jurisdiction, Maryland regulates the employment of minors. Those under 14 are prohibited from engaging in any gainful employment. Those over 14 but under 16 may not be employed during school hours, with certain exceptions, or in certain occupations. All minors under 18 are prohibited from engaging in certain occupations and females over 16 but under 18 from engaging in certain occupations permissible for males. See, generally, 8B

Ann.Code of Md., Art. 100, § 4 *et seq.* These ages should be compared to the age limitations to qualify one as a "dependent child," i. e., under the age of 18, or, in the case of a student, under the age of 21. 42 U.S.C.A. § 606.

14. We call attention to the provisions of § 407 of the Act, 42 U.S.C.A. § 607, which, beginning in 1961, expanded the definition of "dependent child" to include needy children deprived of parental sup-

of the regulation to those to whom it may be said to have some logical relation.

Defendants' contention that the maximum grant regulation was also initially promulgated to encourage parents to limit the sizes of their families is diffidently pressed. This asserted purpose merits little discussion. If, indeed, this is a purpose, the regulation, again, invalidly overreaches. It is not limited to children born after AFDC eligibility is established and, from the evidence, it appears that in the case of the named plaintiffs at bar no children have been born after the circumstances to produce AFDC eligibility occurred.[15]

Thus, in the case of the named plaintiffs at bar, it appears that the claimed purposes of the maximum grant regulation are either totally inapplicable or patently ineffective to accomplish their objectives, and consideration of the several bases of eligiblity for AFDC within the group on whose behalf the named plaintiffs sue, indicates that the same is true of other categories, the substantiality of which is not disclosed. Because it cuts too broad a swath on an indiscriminate basis as applied to the entire group of AFDC eligibles to which it purports to apply, the maximum grant regulation cannot be sustained under the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

–III–

We modify our previous opinion to the extent that we do not decide whether Maryland's maximum grant regulation conflicts with the Act, as amended. On the constitutional basis of our prior decision, however, we find no reason to reach a result different from that previously announced. We reiterate our previous conclusion that Maryland's maximum grant regulation transgresses the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

The Clerk is directed to enter a short order on the docket, granting in part, and denying in part, defendants' motion, as set forth in this opinion. In accordance with our previous instructions, plaintiffs have submitted a proposed form

---

port or care by reason of the unemployment of a parent. This section requires as part of the state's AFDC plan, in addition to the other conditions of § 402 of the Act, that the state provide such assurances as will satisfy HEW that fathers of dependent children will be referred to the Secretary of Labor for participation under a work incentive program, and for providing vocational education to encourage the retraining of individuals capable of being retrained. Moreover, the state is permitted to deny AFDC to any child or eligible relative "if, and for so long as, such child's father is not currently registered with the public employment offices in the State * * *." § 407(b) (2). (C) (i). It is significant that the 1968 Amendments in expanding the work incentive program also limited its application to "unemployed fathers" rather than "unemployed parents." The legislative history of the 1968 Amendments makes clear that the new work incentive program which they established was not intended to apply to "a mother who is in fact caring for one or more children of preschool age, if

such mother's presence in the home is necessary and in the best interest of the children." Senate Report No. 744, 90th Cong., 1st Sess., 2 U.S.Code Cong. & Admin.News, pp. 2859, 2984 (1967). Plaintiff Linda Williams is literally within that category. Thus, there is legislative recognition that the principle of less benefit was not intended to apply to her and others similarly situated.

15. The objective of family planning is part of the Act and treated with greater specificity and logic therein. By the 1968 Amendments, § 402 of the Act, 42 U.S.C.A. § 602, now requires, as part of the state's AFDC plan, that the state develop a program to achieve the objective of "preventing or reducing the incidence of births out of wedlock and otherwise strengthening family life," and for implementing this program by assuring that "in all appropriate cases family planning services are offered them [applicants for AFDC] * * *." § 402(a) (15) of the Act, 42 U.S.C.A. § 602(a) (15).

of decree. Defendants shall present their comments thereon, and, if they be so advised, their suggested form of decree, within five days.