Daisy JOHNSON, Dorothy Miller, Forestine Pressy, individually and on behalf of their minor children and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

NEW YORK STATE EDUCATION DEPARTMENT et al., Defendants-Appellees.

No. 890, Docket 71-1006.

United States Court of Appeals, Second Circuit.

Argued June 16, 1971.

Decided Aug. 13, 1971.

Carl Jay Nathanson, Westbury, N. Y. (Nassau County Law Services Committee, Inc., Leonard S. Clark, Westbury, N. Y., Burr C. Hollister, Mineola, N. Y., of counsel), for plaintiffs-appellants.

Joel Lewittes, New York City (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, Iris A. Steel, New York City, of counsel), for defendants-appellees New York State Dept. of Education and Ewald B. Nyquist.

Henry A. Weinstein, Mineola, N. Y., for defendant-appellee Board of Education of Union Free School District No. 27.

Robert Pressman, Paul R. Dimond, Jeffrey Kobrick, J. Harold Flannery, Cambridge, Mass., for Center for Law and Education, amicus curiae.

Before MOORE, KAUFMAN and TIMBERS,* Circuit Judges.

MOORE, Circuit Judge:

Plaintiffs-appellants are mothers of minor children and bring this action not only individually and on behalf of their children but also on behalf of others similarly situated (a class action). The children attend school in the Union Free School District No. 27, Town of Hempstead (the School District). The action is against the New York State Department of Education, Ewald B. Nyquist, as Commissioner of the New York State Education Department and the Board of Education of District No. 27 (the School Board).

Prior to 1965, each school system in New York State had to provide its own financing for the purchase of textbooks. In 1965, New York Education Law §§ 701 and 703 (McKinney's Consol. Laws, c. 16, 1971) were amended. Quite simply, § 701 provides for state financial assistance ($10 per pupil) for the purchase of textbooks in grades seven through twelve. § 703 provides that qualified voters within a school district may vote a tax for textbooks for grades one through six. Under § 701, a School Board must supply textbooks to all children in grades seven through twelve residing in its district, regardless of whether they attend public or private schools. Under § 703, textbooks must be supplied to children in grades one through six wherever the voters authorize a tax for this purpose.

Where the voters fail to approve a proposed real estate tax to finance school operations, the Board may nevertheless levy a real estate tax on the property owners living within the School District, but only for such amounts as are necessary for "ordinary contingent expenses" of such School District. New York State Education Law, § 2023 (McKinney's Consol. Laws 1971).[1]

On three occasions, the voters of this School District rejected a budget for the 1970–1971 school year proposed by the defendant School Board, after which the Board assessed a tax in accordance with § 2023.

The Board concluded on the basis of Opinion Number 213 of the Counsel to the Education Department, dated July 6, 1967, that expenditures for textbooks are not considered to be "ordinary contingent expense" items within the meaning of § 2023 of the Education Law. This opinion was based in part on the fact that § 703 authorizes a vote on such expenses. Therefore, the Board decided that it was not legally entitled to tax to raise money for textbooks.[2]

---

* Chief Judge, District of Connecticut, sitting by designation when oral argument was heard.

1. Section 2023 provides:
"If the qualified voters shall neglect or refuse to vote the sum necessary for teachers' salaries, after applying thereto the public school moneys, and other moneys received to be received for that purpose, or if they shall neglect or refuse to vote the sum estimated necessary for ordinary contingent expenses, the sole trustee, board of trustees, or board of education may levy a tax for the same, in like manner as if the same had been voted by the qualified voters."

2. Because no budget was approved, it was necessary for the School Board to charge for various other optional services and supplies. Thus, children living less than

The complaint sought the following relief:

(1) that a three judge District Court be convened to determine the controversy;

(2) that preliminary and permanent injunctions be entered enjoining defendants from enforcing § 701 of the New York Education Law on the ground that the classification of pupils in grades one to six and grades seven to twelve is "arbitrary, irrational and discriminatory"; and

(3) that a declaratory judgment be entered declaring § 701 et seq. unconstitutional as violating the Fourteenth Amendment.

More specifically, the First Cause of Action claims that § 701 "individiously discriminates * * * by creating an arbitrary and discriminatory classification which deprives plaintiffs and members of their class of equal protection of the law and an adequate education." A Second Cause of Action alleges that §§ 701 and 703 impose a majority vote approval of a tax assessment to enable children in grades one to six to receive free textbooks and that this constitutes a denial of equal protection. A Third

Cause of Action states that pursuant to §§ 701 and 703 textbooks can be obtained in grades one to six only upon the payment of a rental fee ($7.50 per pupil); that plaintiffs are indigent and cannot pay a fee;[3] and that by reason of their poverty their children are deprived of equal educational opportunity. They describe the potential situation quite realistically by alleging (Complaint, XII (b)):

"Indigent children sitting bookless, side by side in the same classroom with other more wealthy children learning with purchase [sic] textbooks engenders a widespread feeling of inferiority and unfitness in poor children and is psychologically, emotionally and educationally disastrous to their well being."

An order to show cause for a temporary restraining order was issued by Judge Travia. Affidavits and memoranda were submitted in support of and in opposition to the application. The Board of Education and the Superintendent of Schools answered demanding dismissal of the complaint.

In his decision, Judge Travia assumed jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1343[4] and proceeded to con-

---

a given distance from the school (which varied according to age) were required to walk to school or pay a fee for transportation, and charges were made for certain other supplies including workbooks, duplicating paper, materials, etc. Children were also required to provide their own pens, pencils, notebooks and the like. Although these facts were mentioned in the complaint, this action only attacks the failure of the defendants to provide textbooks.

3. § 131–a of the New York State Social Services Law (McKinney's Consol. Laws, c. 55, Supp. 1971) provides maximum amounts for benefits to be paid to plaintiffs, and abolishes the old system of special grants for specific items of need, replacing them with fixed grants to be determined based on the needs of families in the area where the recipient lives. Plaintiffs allege that under the old system, grants were made to pay for textbooks. In Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the

Supreme Court held this section, as originally enacted, to be in violation of 42 U.S.C. § 602(a) (23) which requires that a state in order to receive federal benefits must not lower the standard of need in use in that state on January 1, 1967. Thereafter, the New York State Legislature passed the new version of § 131–a now in effect, excluding from the maximums such items as housing, fuel for heating, furniture; child care services and the like. In the face of the new law, New York has continued to receive federal funds, and no allegation is made here that § 131–a is still inconsistent with 42 U.S.C. § 602(a) (23). Thus it would appear that the fixed allowance received by plaintiffs was intended to cover this as well as other contingent needs. This is especially so since the failure to provide books resulted in a similar expense for all children in the School District.

4. Since we conclude that the District Judge properly dismissed the entire complaint, we need not discuss which defendants

sider "the claimed deficiencies on the ground that the complaint fails to state a claim upon which relief can be granted. F.R.C.P. 12(b) (6)." 319 F.Supp. at 278. In essence the court held that in enacting §§ 701 and 703, the Legislature acted on a reasonable basis free from irrationality or arbitrariness; that "the Legislature was entitled to allocate its grant to pupils in those grades where it would do the most good"; and "[that] New York State has a legitimate compelling interest in seeing to it that as many as possible of its children receive textbooks." 319 F.Supp. at 280. The court, therefore, denied plaintiffs' motion and dismissed the complaint. From the denial of the motion for the convening of a three judge statutory court, and the dismissal of the complaint, plaintiffs appeal. In addition to the briefs of the parties, this court has the advantage of a well-prepared brief and reply brief submitted by the Center for Law and Education of Harvard University.

� ▌▌ At the outset, there must be a determination as to whether Judge Travia properly denied plaintiffs' motion for the convening of a three judge court. If a three judge court is ultimately to decide upon the rationality of the New York State Legislature's enactment of §§ 701 and 703, there is little to be gained by having this court of three judges subject its own rationality to further scrutiny.

The guidelines stated by the Supreme Court in Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 1296, 8 L.Ed.2d 794 (1962) were that the "[district] court's inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three judge statute." But what is "substantial"? And who is to make this decision? Quite obvious-

ly, only the court of last resort—and even then the concept of rationality of legislative judgment may be decreed by the narrow margin of a five to four vote. Searching further in a field where precedent is supposedly helpful, we find that the district court may reject a constitutional claim "because its unsoundness so clearly results from the previous decisions of this court [the Supreme Court] as to foreclose the subject." California Water Service Co. v. City of Redding, 304 U.S. 252, 255, 58 S.Ct. 865, 867, 82 L.Ed. 1323 (1938).

This admonition requires research into decisions of the Supreme Court which might "foreclose the subject." If the decisions justify such a conclusion, the Supreme Court with all its pressing business should not have to cope with indiscriminate three judge appeals. This case is an example. The district judge hears the case and this court hears it. Four judges. Should this court send the case to a three-judge court, two more? Then to the Supreme Court. Fifteen judges in all will have reviewed the rationality of a legislative body. If we affirm, four judges will have been involved and the Supreme Court at least will have the privilege of deciding whether they wish to become further involved.

Recently the three judge court problem was considered by this court in Miller v. New York Stock Exchange, 425 F. 2d 1074, cert. den. 398 U.S. 905, 90 S. Ct. 1696, 26 L.Ed.2d 64 (1970), wherein the question was whether "we must nevertheless reverse because the result was not so clearly predestined that he could dispense with having two other judges, possibly two of us, help him reach it—and this even though the State, for whose benefit the three-judge provision was enacted, was quite content to have him act alone." We concluded that it was unnecessary to reverse under these circumstances even though it denied the plaintiffs a direct appeal to the Supreme Court. We referred to the guidelines set

were appropriate parties under § 1983 and the Eleventh Amendment. See Mc-

Millan v. Board of Education, 430 F.2d 1145, 1148, 1149 (2nd Cir. 1970).

forth in Green v. Board of Elections, 380 F.2d 445, 449 (2nd Cir.), cert. den., 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1967), Judge (now Chief Judge) Friendly saying:

"But [not having a direct appeal to the Supreme Court] is hardly of great moment in view of the immediate availability of certiorari to the Court of Appeals and the likelihood of this being granted if the Supreme Court thinks a constitutional claim may have been erroneously rejected."

The limited area for the three judge court was further defined by Judge Kaufman in Astro Cinema Corp., Inc. v. Mackell, 422 F.2d 293, 298 (2nd Cir. 1970):

"This is particularly so when the aim of § 2281 was to protect the States against declarations of unconstitutionality emanating from a single district judge. While it is true that plaintiff loses his direct appeal to the Supreme Court, not only is that body capable of remedying any injustice through the device of certiorari, but the direct appeal provision, in context, seems far more likely to have been for the benefit of the state than the plaintiff." [5]

The easiest solution for the district judge, whenever the words "United States Constitution" or "Fourteenth Amendment" appear in a complaint, would be to relieve himself of two-thirds of the responsibility for the decision by requesting the convening of a three judge court. This would seemingly be the approach of the Fifth Circuit as declared in Jackson v. Choate, 404 F.2d 910, 913 (1968), in which the Court believed that "unless it is determined that it was an open and shut case three Judges must pass on the merits even though it means that three more must do so again." The Court felt that it would be better to "constitute a three judge court, and allow that court to determine initially" whether it should have been constituted. This Court recently declined to adopt this policy. A district judge should not feel that he is merely a rubber stamp or that he exercises his judgment at his peril. In Heaney v. Allen, 425 F.2d 869, 871, 872 (1970), this Court said:

"If a three-judge Court is once assembled, the temptation to stay together is strong. Indeed, as pointed out in Swift & Co. v. Wickham, 230 F. Supp. 398, 410 (S.D.N.Y.1964), appeal dismissed for lack of jurisdiction, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), aff'd, 364 F.2d 241 (2nd Cir. 1966), cert. denied, 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967), it is usually rather idle for the three judges to waste time deciding whether they have been properly assembled, since the three-judge court has jurisdiction in any event whereas a wrong decision to return the issue to a single judge can create all sorts of trouble. The Fifth Circuit practice thus means in effect not only that three judges will have been called together to decide a question that in fact was determinable by one but that an appeal will almost certainly be added to the Supreme

---

5. In that case, we refused to remand for a three judge court even though we felt that the constitutional objections raised were "not clearly insubstantial" and even though we directed defendant therein to return to plaintiffs an allegedly obscene film which the defendant District Attorney had seized from plaintiffs, because it appeared that an injunction would not there have been an appropriate form of relief. So too here. The defendant School Board in its answer indicated that it favored supplying all children with textbooks, and that it had suggested to the voters that such action be taken. Under these circumstances, it is clear that declaratory relief would be sufficient in the event that the complaint had been meritorious. Furthermore, under Rockefeller v. Catholic Medical Center, 397 U.S. 820, 90 S.Ct. 1517, 25 L.Ed.2d 806 (1970), it is now clear that where such relief is granted, there is no direct appeal to the Supreme Court, and, although we are not called on to decide the question herein, after *Catholic Medical Center*, it is dubious that a three judge court need be convened in any event where it is evident that injunctive relief will not be granted.

Court's docket, an unfortunate burden on that overworked tribunal."

No disagreement is voiced with the Fifth Circuit's concern that "it takes judicial prescience of a Delphic order to say with certainty that the attack is insubstantial" (Jackson at p. 913 of 404 F.2d), but the prophetess did not abstain from her prophecies because of doubt. She merely couched them (not unlike some court decisions) in terms that lent themselves to divers constructions. Therefore, although this case may not be "open and shut" (so few cases are), the decisions of the Supreme Court and other courts which are as analogous as possible to this case should be examined to ascertain whether they "foreclose the subject." If they do, we should avoid a procedure which will make for repetition. Of course, no two cases involving equal protection are alike as to facts and, were mere factual variation the test, all cases should be channeled to the Supreme Court on the chance that some distinguishing feature might be found. However, the Supreme Court reminds us that "[t]he Three-judge requirement is a technical one to be narrowly construed. Phillips v. United States, 312 U.S. 246, 251 [61 S.Ct. 480, 483, 85 L.Ed. 800]" Bailey v. Patterson, 369 U.S. 31 at 33, 82 S.Ct. 549 at 551, 7 L.Ed.2d 512 (1962). See also Goldstein v. Cox, 396 U.S. 471, 90 S.Ct. 671, 24 L.Ed.2d 663 (1969); Rockefeller v. Catholic Medical Center, *supra,* Gunn v. University Committee, 399 U.S. 383, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970). We believe that a review of the Supreme Court's decisions in related situations justifies affirmance of Judge Travia's opinion and our own in not remanding to a three judge court.

Our function is not to enact laws for the State of NewYork or to tell the Legislature how better they could have legislated. We are restricted to making an examination of the law as actually enacted and to declaring whether there is a reasonable basis for this classification.

■ Any state-created classification which is attacked as a denial of equal protection must be examined against either of two constitutional standards: (A) that the classification is rationally related to a legitimate state end (see McDonald v. Board of Election, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)); or (B) that the classification is justified by a compelling state interest. See, e. g., Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

■ Judge Travia applied standard (B) and found a compelling state interest (319 F.Supp. at 278). The legislative purpose behind § 701 indicates that the Legislature sought to promote education in the fields of science, mathematics and foreign languages—an end which could be accomplished through the furnishing of textbooks in the grades which covered those subjects (seven through twelve). Judge Travia therefore reasoned that whichever standard is applied is of little consequence because the legislative scheme is reasonable; it is buttressed by compelling state justifications; and it is not tainted with the slightest hint of invidious discrimination.

Supreme Court decisions would indicate that standard (A) is also appropriate in cases such as this.

In Dandridge v. Williams, 397 U.S. 471, 484, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), the Supreme Court stated that "[I]f the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369]." There, the State of Maryland had "to reconcile the demands of its needy citizens with the finite resources available to meet these demands." *Dandridge,* at p. 472, 90 S.Ct. at 1155. The Court recognized that in the area of economics and social welfare, even where such legislation involves "basic economic needs of impoverished

human beings," "the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy." *Dandridge*, at pp. 485, 486, 90 S.Ct. at 1162.

This proposition has long been accepted by the Supreme Court. In McGowan v. Maryland, *supra*, 366 U.S. at 426, 81 S.Ct. at 1105 the Court said:

"Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests upon grounds wholly irrelevant to the achievement of the State's objectives. * * * A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

Similarly, in McDonald v. Board of Elections, 394 U.S. 802, 89 S.Ct. 1404, 22 L. Ed.2d 739 (1969), the court (Warren, *Chief Justice*) said:

"Though the wide leeway allowed the States by the Fourteenth Amendment to enact legislation that appears to affect similarly situated people differently, and the presumption of statutory validity that adheres thereto, admit of no settled formula, some basic guidelines have been firmly fixed. The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause *only if based on reasons totally unrelated to the pursuit of that goal. Legislatures are presumed to have acted constitutionally* * * * and their statutory classifications will be set aside only if no grounds can be conceived to justify them [citations omitted]. With this much discretion, a legislature traditionally has been allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute

to the legislative mind,' Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489 [75 S.Ct. 461, 465, 99 L. Ed. 563] (1955); and a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked. * * *"

Consistent with this theory, in Briggs v. Kerrigan, 431 F.2d 967, 969 (1st Cir. 1970), aff'g 307 F.Supp. 295 (D.Mass. 1969), the Court approved of a Boston practice of giving free lunch only to children in the secondary grades, citing "the wisdom of the reminder in *Dandridge* that the Fourteenth Amendment does not require government either to attack a program in its entirety or not at all." With limited resources, the reason for mandating textbooks only for children in the upper grades is made apparent by the following statement of purpose which accompanied the passage of § 701 by the New York Legislature:

"The security and welfare of the nation require the fullest development of the mental resources and skills of its youth. This calls for more adequate educational opportunities and increased efforts to educate more of the talent of our nation and requiring the correction of those imbalances in our educational programs which have led to an insufficient proportion of our population educated in the fields of science, mathematics, foreign languages and other non-sectarian subjects. * * * It is hereby declared to be the public policy of the state that the public welfare and safety require that the state and local communities give assistance to educational programs which are important to our national defense and the general welfare of the state." (Laws of 1965, Ch. 320, Sec. 1).

In the opinion of the Legislature, the goals sought to be achieved were best realized by supplying books during the years in which the specified subjects principally were taught. Sound argument can be made that children in the

formation years in grades one to six should have books and of a value far in excess of $7.50 if a maximum of educational opportunity is to be achieved. However, the Legislature was not required to address itself to this argument where the action it did take was clearly justified in terms of the goals it sought thereby to advance. Thus, plaintiff's first claim does not raise a substantial constitutional question, the answer to which is not to be found in Supreme Court precedential guidance.

▇ The second claim made by plaintiffs, that they were subjected to an unfair burden in that they could not have books unless the voters approved is clearly foreclosed by James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). That case involved a California statute which provided that low-income housing could not be built without voter approval. As the dissenting opinion there pointed out "[p]ublicly assisted housing developments designed to accommodate the aged, veterans, state employees, persons of moderate income, or any class of citizens other than the poor, need not be approved by prior referenda." However, the Supreme Court approved this arrangement because "refer-

endums demonstrate devotion to democracy, not to bias, discrimination, or prejudice." § 701 does not make any such differentiation based on the income level of the proposed recipients, but instead draws the lines according to grade level.[6] Thus, clearly this law is a valid means by which New York leaves some control over the school budgets to the voters of the affected school districts.

The claim that § 701 discriminates against indigents is also without merit. In so far as this claim suggests that the State should rearrange its scheme for financing public school education so as to obviate the necessity for voter approval of funds for textbooks for primary school children, it is precluded by *Valtierra* for the reasons stated above.

At oral argument, plaintiffs did not press any broader attack on New York's failure to provide textbooks, conceding that if New York had not provided textbooks to students in the secondary grades, their contentions would fail. The *amicus* raises a broader question which is hinted at by the plaintiffs in their brief: that wherever the State undertakes to provide education,[7] there is a duty to provide free textbooks.[8]

---

6. The enactment of § 701 provided public funds for textbooks of children in private and parochial schools for the first time in the modern history of New York State. The passage of § 701 resulted in large part from pressure from those whose children attended these schools and in the face of substantial constitutional challenge on church-state grounds, which challenge was rejected in Board of Education of Central School Dist. No. 1 v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). It is not unlikely that the legislature felt that funds supplied to children attending private schools should be subject in part to voter acceptance of local school budgets, just as are portions of the funds going to public school children. Thus, persons who would otherwise have no stake in the school budget because their children attended non-public schools were given such a stake, and the difficulties involved in habitual opposition to school budgets from those with no stake in such budgets were lessened. So delicate, com-

plex and fair a political balance should not be the subject of rearrangement by the federal courts.

7. Since there is no affirmative federal constitutional duty for the States to provide education to its students, duties imposed on the States are imposed on the basis of a finding that the state is discriminating invidiously in the way it conducts such education as it chooses to provide. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ; Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

8. From a procedural point of view, it is clear why plaintiffs have not pressed this contention. The complaint asks only that § 701 be declared unconstitutional and its enforcement enjoined, but that section in no way prevents the School Board from providing textbooks and § 703 specifically authorizes the voters to assess a tax for such purpose. If it is a constitutional

Given that it is clear that the State was privileged to assign to the School District the task of financing textbooks used in the lower grades and that it was privileged to assign the voters of such School District the task of deciding whether or not to supply the funds for such textbooks, the only remaining question is whether the voters were privileged to deny such requests for funds while still endeavoring to provide an education for the students of the District. The argument that they were not so privileged is based on two related lines of case law. The first is that group of cases providing indigents, especially indigents accused of crime, access to the Courts and free legal counsel.[9] The reasoning of these cases is that the State is required to provide these services and access because to do otherwise would be to deprive indigents of due process. Obviously, though, due process is not involved here. The other more general line of cases relates to the Equal Protection Clause. These cases, which are strictly limited in their scope, all deal with conditioning the exercise of some fundamental right on the payment of money, or forfeiture of benefits otherwise available, without a showing of "compelling

state interest."[10] These cases are inapplicable here for although education is no doubt an area of fundamental importance, the Supreme Court has made clear its view that in the area of social welfare, the "compelling state interest" theory does not apply even though basic needs may be involved.[11] Plaintiffs suggest that McMillan v. Board of Education, *supra*, held that question involving the right of poor people to educational services presents substantial constitutional issues. In that case, brain damaged children who could afford private school tuition of approximately $3000, who gained admission to such schools and actually attended them, received a grant from New York in the amount of $2000; other brain damaged children received special public education, at a cost well in excess of $2000. Plaintiffs could not gain entry to the public schools because of a waiting list and could not afford the private school tuition differential. The Court felt that the fact that indigents received nothing from the program while others received large sums in cash or equivalent services was sufficient to justify a remand to a three judge court, although the Court thereby remanding was "not suggesting that [the issues] will

requirement that schools provide children with free textbooks where the children are being provided a free education, it is not the State statute that is offensive but rather the legislative action of the voters of the School District in failing to do that which is allegedly constitutionally required, for surely if the voters of all School Districts in the State subject to §§ 701 and 703 approved taxes for textbooks, no constitutional violation under this third theory could be claimed. Thus, this theory is actually an attack on a local act and is not properly the subject of a three judge court regardless of its merits.

Furthermore, in order to properly raise this question, plaintiffs would also have to amend their complaint to attack the constitutionality of the voters' action.

9. See e. g., Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Burns v. Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed. 2d 1209 (1959); Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39

(1961); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

10. See e. g., Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) [right to travel guaranteed by privileges and immunities clause may not be conditioned upon the forfeiture of welfare benefits]; Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971) [right against deprivation of liberty without due process may not be conditioned upon payment of a fine where no jail sentence imposed and person unable to pay fine]; Harper v. Virginia State Board of Elections, 383 U.S. 663, 669–670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) [right to vote guaranteed by fourteenth and fifteenth amendments may not be subjected to poll tax even where twenty-fourth amendment is inapplicable].

11. Certainly, no one would contend that a student's need for textbooks is any more fundamental than such items as food and clothing which are provided through welfare grants.

necessarily be resolved in plaintiff's favor."

However, that Court expressly recognized that the State was under no constitutional duty to provide any grants whatever to such students, and that it could remove constitutional doubts merely by providing $2000 grants to all children similarly affected. Here all similarly situated students are being treated alike; no public money whatever is being spent in the School District for the provision of textbooks to children in the primary grades. It is undisputed that such money as the School Board has to spend is being spent in such a way as to benefit all students (i. e. on teachers' salaries, building maintenance and the like).[12] In *McMillan*, had $2000 grants been made to all students not attending public schools, which the *McMillan* Court felt would remove constitutional doubt from the statute, those who spent the additional money and attended private schools would receive a better education. Similarly, in this case those who can afford textbooks will also no doubt receive a better education than those who cannot but that is because they had the financial means to supplement that which the State provides and not because the State has provided them with more than has been provided plaintiffs.[13]

Unless the courts are to take over legislative functions and to decree that all children in all grades are to have free textbooks, the judgment of the Legislature should control. That judgment was not exercised in an arbitrary and unreasonable manner. Although the Legislature differentiated between two groups of grades in its allotment, the discrimination cannot be characterized as "invidious." Upon the record and the decisions relating to the appointment of three judge courts and upon the merits, Judge Travia acted properly in denying the convening of a three judge court and in dismissing the complaint.

Affirmed.

KAUFMAN, Circuit Judge (dissenting):

I dissent and would hold that plaintiffs have established at the very least a substantial claim that as applied in the Union Free School District No. 20, Town of West Hempstead, where their children are enrolled in the public schools, New York Education Law § 703 deprives indigent children of the equal protection of the laws.[1]

Despite the tone and intimations in the lead opinion's discussion of the appropriate standard for convening a three-judge court, I understand Judge Moore

---

12. Plaintiffs were of course given the benefit of such instruction notwithstanding that they did not rent textbooks. Compare Byrd v. Sexton, 277 F.2d 418 (8th Cir. 1960) (Blackmun, *Judge*) [student excluded from public school for failure to pay enrollment fee denied federal relief].

13. Plaintiffs ignore the impact of the welfare benefits they receive, which under the applicable federal statute and Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), *supra*, should be adequate to cover this type of expense.

1. In *Boddie*, the argument found decisive by the district court and by the majority here—that the state has primary responsibility for deciding how to spend limited resources—was explicitly considered and rejected. I agree that McInnis v. Shapiro, 293 F.Supp. 327, 336 (N.D. Ill.1968) (decided by a three-judge court), aff'd 394 U.S. 322, 89 S.Ct. 1197, 22

L.Ed.2d 308 (1969) (per curiam) and Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), among the cases cited by the majority render insubstantial plaintiffs' subsidiary theories that New York discriminates between elementary school students and those in higher grades by providing only the latter with free books, or by conditioning free books for the former only on a vote of the electorate. Unfortunately, discussion of these insubstantial arguments consumed the *entire* opinion of the district court below and also claims the preponderance of the discussion of the majority here. But the essence of plaintiffs' case is discrimination between poor children in elementary schools without books and their more affluent classmates who can afford texts. The limited resources argument is no more availing to answer that claim than it was in *Boddie*—or *Griffin, Douglas,* and *Harper, infra.*

ultimately to agree that we are indeed bound on this appeal to inquire no further should we find a "substantial" claim made out, Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962), viz. one not virtually "foreclosed" by controlling precedent, California Water Service Co. v. City of Redding, 304 U.S. 252, 255, 58 S.Ct. 865, 82 L.Ed.2d 1323 (1938). Nor do I interpret my own opinion in Astro Cinema Corp., Inc. v. Mackell, 422 F.2d 293, 298 (2d Cir. 1970), declining to convene a three-judge court to evaluate plaintiffs' "futile" request that an impending criminal prosecution be enjoined, which the panel found "completely unwarranted," as in any sense suggesting that we are empowered to decide more at this juncture than whether plaintiffs' claim is "substantial."

Nevertheless, it is appropriate to analyze further the interesting question raised by the majority as to the relation between the three-judge court statute applicable here, 28 U.S.C. § 2283, and considerations of judicial economy. While I do not question the majority's arithmetic, I do suggest that the implication that over the long term, applying a stricter standard on review of a decision refusing to convene a three-judge court will consume fewer judges' energies amounts at best to a self-fulfilling prophecy. The lead opinion overlooks that convening a three-judge court in the first instance, because it bypasses the normal appellate level, can be expected for that reason to involve fewer judges in the ultimate disposition of a case than does a refusal to convene such a court. Not only will two fewer appellate judges then pass on the merits than otherwise (there will be only one additional district judge)—assuming an appeal would have been taken from a district court judgment refusing to convene a three-judge court—but the possibility of full in banc consideration at the appellate level is avoided. Nor is this the end of the matter, for the majority's own analysis of the large number of judges necessarily drawn in when an application for a three-judge court is improperly denied, far from supporting a stricter standard than that established by precedent, leads to the conclusion that the "substantial claim" test may lead to the most efficient operation of the three-judge court scheme as presently constituted. I agree with Judge Moore, as I said in *Astro-Cinema*, that the primary purpose of this three-judge court statute is to prevent a single judge from interfering with a state's governmental operations. But the implication of this is not, as one might at first impression suppose, that it is futile to convene a three-judge court other than to ratify a single district judge's own conclusion that a state statute is indeed unconstitutional. If district courts did apply that harsher standard, there would inevitably be a higher percentage of reversals on appeal, and thus a greater waste of judicial resources.

This is not to say that the three-judge district court procedure remains the desirable and efficient procedure envisioned when Congress provided for it. At least for administrative reasons and perhaps because of more basic flaws in its structure as well, it is often in practice costly, cumbersome and time-consuming, particularly in the face of the great increase in the volume of cases in appellate courts and the corresponding influx of demands for three-judge courts. But until Congress overhauls the system, I believe judges should not in their frustration yield to the temptation to legislate their own solutions [a principle rigorously adhered to by the author of the lead opinion in the past, see Caplin v. Marine Midland Grace Trust Co., 439 F.2d 118, (2 Cir., 1971)], especially, as here, when the judicial statutory amendment is as likely to *increase* burdens and delays as to alleviate pressures. The test is and should remain—is there a substantial claim?

On the merits, it is difficult to square the majority's conclusion that the claim presented in this case is not substantial with its admission that "education [is] an area of fundamental importance" and

its recognition of binding precedent requiring the state to demonstrate a "compelling state interest" to justify conditioning the exercise of fundamental rights or the enjoyment of fundamental "privileges" upon the payment of money. The majority also concludes that the plaintiffs "realistically" describe the situation of their sons and daughters when they portray "[i]ndigent children sitting bookless, side by side in the same classroom with other more wealthy children learning with purchase[d] textbooks," a situation that inevitably "engenders a widespread feeling of inferiority and unfitness in poor children and is psychologically, emotionally and educationally disastrous to their well being." No authority supports the melancholy conclusion that plaintiffs have failed to describe even a substantial claim that their children, severely handicapped relative to their more affluent classmates solely by the operation of the statute complained of, are deprived of equal protection.

The ideal of education in our society is to free men and women to pursue their own lives more fully. Economic and social mobility, cultural richness and diversity, the inheritance of arts, skills, thoughts and values, the strong and flexible operation of democratic political processes, the growth and function of private institutions and associations, the habits, structures, virtues and idiosyncrasies that make our society unique and coherent take root in formal and informal education. In New York State, as elsewhere in the United States and in most other developed countries, the government has arrogated to itself responsibility for administering and enforcing a formal and public system of education. It has done so both by the requirement of law that all children receive schooling until they reach a specified age and by providing schools, free to their users, supported by tax revenues. Courts have been alert to the potential for unwarranted incursions by the states into constitutionally protected spheres of individual liberty— which are nothing less than rights to *self*-education and *self*-direction—inher-

ent in compulsory and public education. They have also rightly viewed with skepticism and suspicion state action that has resulted in systematic inequality between the quality of public education offered different classes of children.

The capstone of cases recognizing and protecting children's rights against overzealous state attempts to regulate their lives beyond constitutional bounds is the recent decision of the Supreme Court in Tinker v. Des Moines School Dist., 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1970) counting freedom from unjustified prior restraints of speech and expression among the "fundamental rights which the State must respect" in administering their public schools. *Id.* at 511, 89 S.Ct. at 739. The majority opinion in this case is inconsistent with the philosophy of *Tinker* and its predecessors, see Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Pierce v. Society of the Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), as expressed in West Virginia, State Bd. of Ed. v. Barnette, 319 U.S. 624 at 637, 63 S.Ct. 1178, at 87 L.Ed. 1628, quoted in *Tinker*, 393 U.S. at 507, 89 S.Ct. at 737:

The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Board of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

Unless inequality based on wealth is a principle of our government, I am unable to reconcile these words with today's opinion.

Nor are the words of the fountainhead of parallel and complementary precedent guaranteeing equal educational opportu-

nity without the vestige of invidious discrimination, Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 any less incompatible with the majority's resolution of this case:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

Despite this, the defendants have admitted in their formal answer in this litigation that plaintiffs' children are not offered an education on terms equal to those of other children attending the same schools whose parents happen to be wealthier than are theirs. In evaluating the adequacy of the present complaint to support impaneling a three-judge court, we must accept as true its averment that because the voters in plaintiffs' school district refused to provide, as they were empowered to do, free school books to children in grades one through six of their public schools, or at least to those whose parents cannot afford to rent them, plaintiffs' children must attend school without the aid of textbooks provided to other children in the same schools and same grades whose parents can afford the rental fee charged by the state for their use. See Boddie v. Connecticut, 401 U.S. 371, 373, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). Defendants have admitted that "textbooks * * * are essential to a quality educational program and a necessary and basic tool in the education of youngsters."

Curricula not keyed to textbooks are advocated by some educators and have been put into practice in some private and public schools. But defendants do not dispute that New York's own public education system continues to rely extensively on the traditional method of teaching from texts. Children without the benefit of these texts one must imagine and as affidavits before us aver, are afforded a markedly inferior education during their early years of schooling than are their non-indigent peers. The psychological and social impact of the badge of inferiority implied by their disfavored treatment must extend far beyond the classrooms and aggravate to an incalculable degree other disadvantages these indigent students must in our society inevitably struggle against as a result of the financial straits of their parents. The enduring lesson they are thus taught in the public schools they attend without books is that wealth breeds favored treatment while disadvantage leads on to still greater handicaps.

In short, the legislative scheme here creates two classes of children, not physically separate yet unequal—the poor suffer while the rich receive the full benefits of the state's educational program. But "[l]ines drawn on the basis of wealth or property, like those of race * * *, are traditionally disfavored." Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 668, 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169 (1966).

In Boddie v. Wyman, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), decided this term, the Court struck down a Connecticut statute that required the payment of an average $60 in court fees and costs as a prerequisite to obtaining a divorce on the ground that the fees effectively barred some indigents from dissolving their marriage contracts. The fees required by New York here as a prerequisite to the distribution of textbooks,

according to evidence presently in the record, range from $6.00 to $58.50 per household, and effectively bar plaintiffs' children from receiving an adequate public education.

The majority attempts to dismiss *Boddie* in a footnote by labelling it a "due process" rather than an "equal protection" case. But *Boddie* is grounded on the "basic position of the marriage relationship in this society's hierarchy of values." Only "through the looking glass" might one rank a child's interest in education lower on the scale of this nation's traditional values than an adult's interest in a divorce.

The majority's similar disposal of *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) in the same footnote with *Boddie* as only another "due process" case is even more unavailing, for that decision rested by its own language squarely on the equal protection guarantee, as well as on due process, holding that a state may not deny a free transcript to an indigent where necessary to take a direct appeal from a criminal conviction. The court's observation in *Griffin* that "[i]n criminal trials a State can no more discriminate on account of poverty than on account of religion, race, or color," *id.* at 17, 76 S.Ct. at 590, applies with equal force to the fundamentally important institution of public education. See also *Douglas v. California*, 372 U.S. 353, 355, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Failure to appoint free counsel for an indigent's first appeal as of right from state criminal conviction is unconstitutional "discrimination against the indigent."

Entirely apart from Supreme Court precedent, today's decision is strikingly inconsistent with a recent decision of this court, *McMillan v. Board of Education*, 430 F.2d 1145 (2d Cir. 1970), requiring that a three-judge court be convened to consider plaintiffs' claim that their poverty would not permit them to take advantage of the state's offer to pay $2,000 toward the tuition of special private schools for handicapped children. Plaintiffs in *McMillan* alleged they were ineligible for the stipend bcause they could not afford the difference between the grant and full tuition. *McMillan* was a less compelling case than is this one for convening a three-judge court, since the state's usual public education facilities were open to plaintiffs' children on an equal basis with other children. In *McMillan*, the students were unable to make full use of these facilities because of their own physical handicaps. Here the state itself has *artificially* handicapped indigent children by denying them school books provided to others who can afford them.

It will not do to say, as does the majority, that in this case "public funds are distributed equally." The same argument would apply if schools charged a toll to defray the cost of operating public school buses. Were indigent children denied entry to the bus that passed their doors each morning because they could not bear their share of the cost—and thus were barred from public schools attended by their richer neighbors— would the answer also be "equal expenditures and an offer on equal terms to each child is sufficient"?

Here, as in *McMillan*, the essence of the claim is unequal educational opportunity based on wealth. The state has not justified the inequity sufficiently to warrant the refusal to convene a three-judge court.