682

Isadore **MOORE, on behalf of herself and all others similarly situated,** Plaintiff,

v.

**BOARD OF TRUSTEES OF CHARLESTON COUNTY CONSOLIDATED SCHOOL DISTRICT and Gordon H. Garrett, Superintendent of Charleston County Schools,** Defendants.

Civ. A. No. 72-732.

United States District Court,
D. South Carolina,
Charleston Division.

Heard June 15, 1972.

Decided June 22, 1972.

As Amended Sept. 5, 1972.

1. At the hearing on the temporary restraining order plaintiff's counsel stated she attempted part payment out of funds she otherwise would have spent for food stamps (which obviously supplement her income).

2. Which provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citi-

Ray P. McClain, and Frank Epstein, Neighborhood Legal Assistance Program, Inc., Charleston, S. C., for plaintiff.

J. W. Cabaniss, of Grimball & Cabaniss, Charleston, S. C., for defendants.

HEMPHILL, District Judge.

This action, filed June 12, 1972, initiates action by a mother of six, all of whom are enrolled in the public schools of Charleston County, S. C., and two of whom present her immediate concern. Sons Walter, age 15, and Elijah, age 18, during the 1971-72 academic school year were enrolled in the tenth grade at James Island High School in Charleston County, S. C.; unfortunately Walter and Elijah failed their mathematics courses. Her claim is that, in order to receive credit for the courses they would have to repeat the course or to attend summer school. She alleges she was informed that there is a tuition charge of $50 per course, which would entail a cost to her of $100, which would come out of her $200 [1] monthly income, that she did not know they (or either) would fail, and had insufficient notice to allow her to raise the money.

Plaintiff's suit, admittedly a class action under Rule 23, Federal Rules of Civil Procedure, presents a claim that she and the class of persons she represents are financially unable to pay the required tuition fees for summer school, and defendants' policy of requiring the tuition fee has singled out this class and thus denied the children the full benefits of public educational services made available by the defendants, in violation of the Equal Protection Clause of the Fourteenth Amendment [2] to the United States Constitution. Another claim is

zens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

that black families are most likely to lose educational benefits because of the blacks [3] in school who were subjected to inferior educations when the schools were segregated.

Initially, plaintiff seeks a temporary restraining order [4] (the term preliminary injunction was used in the prayer of the complaint) immediately, and a permanent injunction, with collateral mandatory orders of admittance to defendants, barring requirement or imposition of the $50 fee per course for attendance at summer school. Other relief asks the imposition by this court of guidelines as to the charging of tuition fees related to the "poverty guidelines" issued by the Office of Economic Opportunity, an award of plaintiff's costs, attorneys' fees [5], and other relief.

Defendants, denying that state statutory authority was involved [6], allege that the summer school effort is not a part of the school year, and is not funded by school taxes. No applicant who pays the $50, is denied, and no person is denied on the basis of race [7], creed, or color. A supporting affidavit of Dr. Gordon H. Garrett, Superintendent of the Charleston School District, sets forth, among other things, the following facts, which are not contested:

(a) Public schools in Charleston County are run on a nine months basis, teachers are paid for only 185 days, and are not paid for summer months.

(b) There is no legislature requirement that any summer session be held and no State or county funds are provided for such purpose.

(c) The summer classes are not part of the regular school system.

(d) No part of the salaries of summer school teachers are paid out of district funds; all summer teachers are volunteers and are compensated from the tuition fees paid by or for students;

(e) No teacher is required to teach in summer school, and if classes are not sufficiently large to generate tuition fees to pay the salary, that class is not held.

(f) The School District does allow use of facilities (brick and mortar) and provides janitorial service; 59,000 are enrolled in the system, using 88 school buildings; 4300 students are in summer school and 17 buildings are in use.

(g) The cost of summer session is approximately $200,000. There are no school funds available for any summer program.

(h) The School District is currently taxing property in Charleston at the maximum rate allowed by statute.

(i) The School District operates a fully integrated unitary school system in compliance with Federal bureaucratic guidelines and court orders.

Other facts developed at the hearing show that the summer effort is supervised by some district officials (absent pay from tax sources) and the school system gives credit for those courses successfully completed. The federal government formerly paid tuition, or part tuition, for some students, or otherwise formerly supported the program in some way, but such support has diminished and is now minimal.[8] Other differences of a minor nature are not at issue here.

---

3. Apparently the inferior schools did not affect Walter and Elijah in other courses. The word "black" is usually used in cases of this nature as a "red herring" to attract the attention, and hopefully the sympathy of the court.

4. Rule 65(b) Federal Rules of Civil Procedure.

5. Defendants' counsel pointed out that counsel for plaintiff are comfortably salaried professionals of the Office of Economic Opportunity.

6. This was admitted during the hearing, by plaintiff's counsel.

7. Counsel for plaintiff admitted the facts present no evidence of such discrimination.

8. Testimony as to this was lacking.

This court, in the midst of a heavy nonjury term, upon receiving the file, asked the Clerk of the Court to determine identity of counsel for the School District and notify them, and counsel for plaintiffs, of a hearing [9] on the issuance of a temporary restraining order on Thursday, June 15, 1972, at 2:30 p. m. Counsel was notified and cooperated. The summer school session began June 14, and in precaution Walter and Elijah were allowed to attend. At the hearing the court requested, and the School Board assented, that Walter and Elijah remain in school until this order could be assembled and published. The hearing was held as scheduled.

It is obvious, then, that there are no funds available to operate the summer school on the basis demanded by the plaintiff. The Charleston District ranks 47 in the 93 school districts in South Carolina in per capita expenditure per pupil, and the funds allocated are desperately needed by the school system for the regular nine month program. The General Assembly makes no appropriations for summer school teachers [10]. As noted above, the district has already spent beyond its budget and has been forced to borrow money to pay regular operating expenses. If the plaintiff would have the court allocate the funds needed for the regular school program and use such funds for the benefit of the plaintiff and others meeting the OEO "poverty guidelines", the court would be crossing the lines, aborting the purposes, and plans, of school administrators, legislators, and others, who, when left alone by the courts, are in the business of running the schools.

The summer session is not a part of the statutory plan for education in South Carolina. There is no constitutional provision requiring "free" schools in South Carolina, or for free schools in the nation; there is no statutory provision for summer schools, and no provision for financing such schools. This is not a case in which the local school district has sought to charge tuition in violation of a State constitutional or statutory provision requiring free schooling. Summer school is similar to private tutoring or coaching, which are normally paid for by the parents of the child. An unwelcomed parallel is the fact that tuition is charged in State supported colleges and other institutions of higher learning.

Plaintiff argues that because the students are allowed to use the school buildings, and do receive credit if they successfully complete the course, that such is sufficient to warrant this court penalizing everyone who paid tuition, or is willing to pay tuition, by either directing that those who do pay shall pay for those who say they can't, or will not pay, or do not want to pay, and want a free ride, or, in the alternative, the abolition of the summer school system which is a benefit to so many in Charleston. Summer session is open to all students in the county on the same basis, without regard to race, creed, or color.

One might reflect that it is not the fault of the school district that the two students did not pass mathematics. It is not the fault of the school district that so little attention was paid to the progress of the two students, that, according to plaintiff, she did not know they were failing, or that the summer school was available and would cost, until the last minute. Far too many of these cases come into the United States District Courts at the last minute. To this court it appears as a plan and design to urge a Temporary Restraining Order, or other hasty action, at the last minute, on the premise that "something

9. The court did not wish to issue any restraining order without a hearing.

10. Section 21–252, South Carolina Code of Laws for 1962, as amended, provides: State to Pay Teachers' Salaries for 185 days.—

The General Assembly shall make sufficient appropriation to pay the salaries of all school teachers of the public schools on the basis and for the length of one hundred eighty-five days in the elementary and high schools in the state.

must be done now", when it is all too obvious to the court that the matter could have been attended to earlier.

The defendants do not contend that it might not be desirable to provide free summer schooling for all who wish to attend. Defendants do contend, however, that there are many more pressing educational problems within the District for which funds are not presently available. As pointed out by the Supreme Court in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970):

> [T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369. It is enough that the State's action be rationally based and free from invidious discrimination.

In Johnson v. New York State Education Department, 449 F.2d 871 (1971), the State provided financial aid to local school districts for the purchase of textbooks for children in grades seven through twelve, but no such provisions were made for grades one through seven. The Second Circuit Court of Appeals held that this was a reasonable legislative classification and that there was no discrimination since all children in the district were being treated alike; "no public money whatever is being spent in the School District for the provision of textbooks to children in the primary grades. It is undisputed that such money as the School Board has to spend is being spent in such a way as to benefit all students (i. e. on teachers' salaries, building maintenance and the like)."

Plaintiff has called to this court's attention, the very able opinion of the United States District Court for the Northern District of Indiana, Chandler v. South Bend Community School Corporation (Order filed August 26, 1971). Perusal of that case shows that the complaint was directed at the school fees charged in a regular session. In addi-

tion, the State of Indiana was authorized, by statute, the collection of money to help defray costs of textbooks, etc. The action was entirely State action, and under the regular school system. The facts are entirely different from the facts in the case before this court. There we are dealing with public education on a broad level. Here we are dealing with the private summer school effort, privately financed, but open to all who are willing to help defray the expenses.

There is no legislative scheme here which creates two classes of children. The record is silent as to any evidence of arbitrary or invidious discrimination. There is no suggestion, either by the evidence presented or the arguments of counsel, that any discrimination was in mind, or any effort or plan to bar anyone was conceived, or in being, in connection with the assessment of the tuition. The tuition is assessed so the school can take place. It is true that those who support get the benefit. It is also true that unless it is supported by private tuition, no one will get such benefit.

This court finds authority in Dandridge v. Williams, supra, where certain families, who participate in Federal Aid to Families with Dependent Children Program brought suit against the State of Maryland complaining that a statute of that State, an administrative regulation having the force and effect of statute, an administrative regulation having the force and effect of statute, was unconstitutional in imposing a maximum limit on the total amount of aid which any one family unit could receive. The plaintiffs, who had large families, and whose standards of need as computed by the State's financial experts, exceed the maximum of aid which they were entitled to receive under the regulation, brought suit in the United States District Court for the District of Maryland, alleging that the Maryland maximum grant regulation was in conflict with the Federal Social Security Act and with the

equal protection clause of the Fourteenth Amendment. A three-judge district court was convened and held the regulation violated the equal protection clause (297 F.Supp. 450). On direct appeal, the United States Supreme Court reversed the three-judge holding. In an opinion by Justice Stewart, in which four other members of the court concurred, it was held that the maximum grant regulation was not inconsistent with the Social Security Act and was not violative of the equal protection clause. Among other things the majority opinion said:

> The states must respond to this federal statutory concern for preserving children in a family environment. Given Maryland's finite resources, its choice is either to support some families adequately and others less adequately, or not to give sufficient support to any family. We see nothing in the federal statute that forbids a state to balance the stresses that uniform insufficiency of payments would impose on all families against the greater ability of large families—because of the inherent economies of scale—to accommodate their needs to diminish per capita payments. The strong policy of the statute in favor of preserving family units does not prevent a State from sustaining as many families as it can, and providing the largest families with somewhat less than their ascertained per capita standard of need.

> In the era of economics and social welfare, a state does not violate the equal protection clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' Lindsley v. National Carbonic Gas Company, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. [367] 369.

> We do not decide today that the Maryland regulation is wise, that it best fulfills the revelant social and economic objectives that Maryland might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration. * * * But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.

This court, like so many others deluged with a flood of school litigation, recognizes the importance of public education and the damaging effects of limiting the rights to public education; as is expressed in Brown v. Board of Education of Topeka (1954), 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873:

> Today education is perhaps the most important function of state and local government. * * * It is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

The public schools have been recognized as a "market place of ideas", as an essential conduit through which young Americans may exercise rights which have been deemed to be fundamental as well as elementary. Tinker v. Des Moines Independent Community School District (1969), 393 U.S. 503, 511, 89 S. Ct. 733, 21 L.Ed.2d 731.

If we examine the first eight amendments to the Constitution, we find that

the right to public education has not been characterized as a fundamental right. The courts, however, have treated public education as a substantive right implicit in the "liberty" assurance of the due process clause. Richards v. Thurston (1 Cir. 1971), 424 F.2d 1281; Pierce v. Society of Sisters (1925), 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070; Meyer v. Nebraska (1923), 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042. As quoted in the *Chandler* case, supra, Ordway v. Hargraves (D.C.Mass.1971), 323 F.Supp. 1155, 1158, is authority for the recognition that "It would seem beyond argument that the right to receive a public school education is a basic personal right."

This court readily recognizes the need for such judicial policy in these days of high civilization and demanding change. Nevertheless, the fact that a judicial platitude exists does not necessarily imprint its application on every school problem.

As reiterated time and again hereinabove, we are not dealing with a school program which is run by, under the auspices of, or financed by the government of the State, or any subdivision thereof. The effort is local, locally financed, absent any tax money application with the possible rare exception of the janitorial service, and absent any State statutes or directives.

Plaintiff's claim of equal treatment and equal protection might be turned around. Those who pay might well say they are denied equal protection if they are required to pay and others are allowed to travel free. Perhaps the significance of this claim should be reviewed in the ambit of the concurring opinion of Mr. Justice Harlan in Williams v. Illinois (1970), 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586:

The "equal protection" analysis of the Court is, I submit, a "wolf in sheep's clothing," for that rationale is no more than a masquerade of a supposedly objective standard for subjective judicial judgment as to what state legislation offends notions of "fundamental fairness". Under the rubic of "equal protection", this Court has in recent times effectively substituted its own "enlightened" social philosophy for that of the legislature no less than did in the older days of judicial adherents of the now discredited doctrine of "substantive" due process. I, for one, would prefer to judge the legislation before us in this case in terms of due process, that is to determine whether it arbitrarily infringes the constitutionally protected interest of this appellant. Due process * * * is more than a * * * "bulwark . . . against arbitrary legislation."

The plaintiff has failed to impress this court with the justice of her claim. The defendants have convinced the court of the reasonableness, as well as the productivity, of the operation of the summer school as it is presently conducted. The Motion for a Temporary Restraining Order is denied. The Motion for a Temporary Injunction is denied. The Motion for Mandamus to the school authorities and/or others in charge of, or having any responsibility in connection with the summer school is denied. At the hearing on the motions, sufficient facts have been revealed to predict the futility of having a hearing on the merits. However, the same is not denied and this court will wait to be advised whether plaintiff would seek such a hearing.

The motions of plaintiff are denied. And it is so ordered.